Abdul Hassan TAHERZADEH, a/k/a Tony Taherzadeh, Plaintiff-Appellant,

v.

Wayne W. CLEMENTS, et al., Defendants-Appellees.

No. 84–1831.

United States Court of Appeals, Fifth Circuit.

Feb. 3, 1986.

Rehearing Denied April 9, 1986.

Lippe & Lay, Emil Lippe, Jr., Edward A. Galloway, Michael R. Swan, Dallas, Tex., for plaintiff-appellant.

Payne, Spradley & Vendig, F. Franklin Honea, Dallas, Tex., for defendants-appellees.

Before RUBIN, RANDALL and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

This case involves a commercial landlord/tenant dispute. Appellant Taherzadeh sued his landlords, appellees Wayne W. Clements and others, for fraud, breach of contract, and violations of the Texas Deceptive Trade Practices Act.[1] After the conclusion of two trials, Taherzadeh has been adjudicated to owe appellees $111,000 for attorneys' fees. Taherzadeh appeals from the award against him. We reverse and remand for an accounting.

---

1. Tex.Bus. & Com.Code § 17.41 *et seq.* (Vernon Supp.1985).

## FACTS

Appellant, Taherzadeh, was a commercial tenant in a shopping center constructed by appellees Wayne W. Clements, and others. Taherzadeh built a gourmet seafood restaurant named "La Truite" on the leased premises. As of the inception of the lease, appellees had constructed only the outside walls and roof of the shopping center. Appellant thereafter spent several hundred thousand dollars to complete the restaurant and to install additional equipment and furnishings.

Several disputes eventually arose between Taherzadeh and appellees. Taherzadeh claimed there were not enough parking spaces for his restaurant, that appellees did not properly maintain the "common area," that the roof leaked during rain storms, and that the parking lot was defectively constructed so that rain water collected in front of the restaurant. Taherzadeh also claimed that appellees refused to allow him to construct a pole sign bearing the name of the restaurant. Taherzadeh contended that appellees had represented to him that no pole signs would be allowed in the shopping center. Later, however, appellees had constructed a pole sign in the parking lot advertising the name of the shopping center, "Greenville Junction." Taherzadeh contended that this sign confused patrons and greatly harmed his business.[2]

In September, 1979, Taherzadeh left the premises. Appellees subsequently entered the restaurant and removed equipment, furniture, and other property to a warehouse. This property was owned by Gordo Corporation.[3] Taherzadeh had leased the property from Gordo. After appellees seized the property, they did not sell the property, but rather they seem to have kept it in storage indefinitely. There is no indication that appellees have ever sold this property. So far as the record shows, neither party is interested in the current whereabouts of this property.

Taherzadeh brought suit against appellees on several theories including fraud, breach of contract, conversion, and violation of the Texas Deceptive Trade Practices Act. Upon trial, the jury found against Taherzadeh on all of his damage claims except for the pole sign claim.[4] The conversion claim was not submitted to the jury.[5] The jury found that appellees misrepresented that there would be no pole sign erected in the shopping center, and such misrepresentation caused injury to Taherzadeh. The jury, in extremely confusing interrogatory answers, may have found also that Taherzadeh suffered $500,000 in damage as a result of the misrepresentation.[6] In addition, the jury found that appellees, not appellant, had expended

---

**2.** Perhaps other problems had something to do with the restaurant's poor business. A review of the restaurant in the "Weekend" dining section of the Dallas Times Herald rated "La Truite" on a four-star system as: food-1 star (fair); service-0 (poor); atmosphere-2 stars (good); and price-$$$$ (most expensive). The review noted, "the announcement ballyhooing the opening of La Truite proclaimed that it would be 'more than a restaurant ... a complete experience.' That it was, and a completely disappointing experience at that ..."

The reviewer noted in particular to stay away from the Turbot Poche Hollandaise, which "was barely edible," the Lobster Tails with Butter, which "were tough and barely warm when served," and the Shrimp Provencale, which "tasted like they had been rescued at the last minute from a shrimp cocktail." The reviewer was also disappointed with the long wait for service (one hour and nineteen minutes between being seated and hors d'oeuvres) which began when the waiter remarked that he was "too damn busy" to serve them. Appellees in-

troduced this review at trial in an attempt to show that Taherzadeh's damages did not result from any actions of appellees.

**3.** Gordo Corporation is a close corporation owned by the Taherzadeh family. Gordo is not a party to this action.

**4.** The jury also found that appellees failed to maintain the "common area" but awarded zero damages on this claim.

**5.** A special verdict form was used pursuant to F.R.Civ.P. 49(a).

**6.** The confusing jury answers were:
Q. (3) Did Taherzadeh prove that the representation that there would be no free-standing, pylon or pole sign erected or allowed to be erected in the shopping center was made for the purpose of inducing Taherzadeh to enter into the lease transaction?

$111,000 in reasonable and necessary attorneys' fees.

The district judge found that the jury answers concerning the pole sign were "so confused and contradictory that to enter judgment on that part of the verdict on this record would be a miscarriage of justice." The district judge also found that "the jury's determination that Clement's representation was a producing cause of the loss suffered by Taherzadeh of $500,000 worth of improvements and equipment was against the weight of the evidence." The district judge granted a partial new trial limited to liability and damages resulting from construction of the pole sign.

A second trial was held limited to the pole sign issue in March, 1982. The jury

A.   Taherzadeh did not prove.

Q.   (8) Did Taherzadeh prove that the representation that there would be no free-standing, pylon or pole sign erected or allowed to be erected in the shopping center was a producing cause of injury to him?

A.   Did prove.

Q.   (11) What amount of money did Taherzadeh prove to be the difference, if any, between (1) the market value of the leased premises as represented for its intended use, and (2) the actual market value of the leased premises when delivered in July of 1977 for its intended use?

A.   Zero.

Q.   (11A) What amount of money did Taherzadeh prove to be the difference, if any, between (1) what it paid for the leased premises, and (2) the actual market value of the leased premises when delivered in July of 1977 for its intended use?

A.   Zero.

Q.   (11B) What amount of money did Taherzadeh prove would reasonably compensate him for any loss of improvements he made in the leased premises found by you in your answer to question number 8 to have been suffered by Taherzadeh?

A.   $250,000.

Q.   (11C) What amount of money did Taherzadeh prove would reasonably compensate him for any loss of the equipment left in the leased premises found by you in your answer to question number 8 to have been suffered by Taherzadeh?

A.   $250,000.

The jury further found that appellees were negligent in allowing the construction of the pole

found that Taherzadeh had failed to prove that appellees had promised before the signing of the lease that a pole sign would not be erected. Judgment was entered against Taherzadeh on the jury verdict. On July 2, 1983, the district court ruled that appellees could collect their attorneys' fees from Taherzadeh, and judgment was entered against Taherzadeh awarding $111,000 to appellees as reasonable attorneys' fees.

Taherzadeh contends on appeal: (1) the district court erred in granting a partial new trial limited to the pole sign issue; (2) the district court erred in awarding attorneys' fees; and (3) the district court erred in not submitting a jury interrogatory on the theory of conversion during the first trial.

sign, and that such negligence was a proximate cause of injury to Taherzadeh (Questions 23 and 24). In Question 25, however, the jury found that *zero damages* would "fairly compensate" Taherzadeh for the injury found in Questions 23 and 24 (negligent erection of the pole sign).

These answers are confusing. The jury concluded that the pole sign misrepresentation was not made to induce Taherzadeh to enter into the lease (question 3). The question of whether Taherzadeh did in fact rely on the representation in entering the lease (Question 6) was conditioned upon a "Did prove" answer to Question 3, and thus was not answered. The jury found, however, that the misrepresentation did cause damage to Taherzadeh (question 8). The jury then listed as damages $500,000 in improvements and equipment which apparently referred to the restaurant furnishings which Taherzadeh leased from Gordo Corporation and were seized by appellees.

There is no indication that loss of these improvements and equipment had anything to do with the pole sign misrepresentation. Moreover, this award of $500,000 tends to contradict the finding of zero damages given for negligent construction of the pole sign. The fact that the jury found no difference in the market value of the leased premises as represented or in the amount paid by Taherzadeh for the leased premises, and the actual market value of the premises when delivered (question 11 and 11A), creates further confusion. The jury in effect found that appellees had misrepresented that there would be no pole sign erected, but that such misrepresentation did not result in Taherzadeh getting premises worth anything less than what he bargained for. It is unclear what relation the $500,000 for equipment and improvements had to the pole sign misrepresentation.

## I. THE POLE SIGN TRIAL

█ The district judge granted a partial new trial limited to liability and damages from the alleged pole sign misrepresentation. Taherzadeh contends that the pole sign issue was so interwoven with the other issues that it was error for the district judge to grant a partial new trial. The standard which guides a trial court is that a partial new trial "may not properly be resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." *Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188, 1191 (1931).[7]

█ We find that the pole sign issue was separable from the other issues in the trial. The second jury found no liability of appellees because no misrepresentation was made by appellees concerning the pole sign. Evidence bearing upon other asserted breaches of the lease—*i.e.*, lack of parking space, water in the parking lot, a leaking roof, and failure to maintain the "common area"—was irrelevant to the pole sign determination. Taherzadeh was unable to provide any specific reason why the pole sign representation could not be isolated from the other issues. There was no abuse of discretion by the district court, therefore, in limiting the new trial to the pole sign issue.

Taherzadeh also urges that the district court had no reason to grant a partial new trial because the jury's answers could be reconciled. The district judge granted the partial new trial in part because he found that the answer to the causation question—that the pole sign misrepresentation caused the damages—was against the great weight of the evidence. Taherzadeh argues that the jury's answers can be viewed as awarding a conversion measure of damages for the value of the property which appellees seized from the restaurant. This argument lacks merit. The theory of conversion was not even included in the charge or the questions asked to the jury, and appellant did not object.[8] We find that the district court did not abuse its discretion in ordering a partial new trial limited to the pole sign issue.

## II. ATTORNEYS' FEES

### A. *Propriety of the Award*

The district court awarded $111,000 in attorneys' fees against Taherzadeh and in favor of appellees. The basis for this award was article 19.4 of the lease.[9] Under this lease provision, a "breach or default" by tenant was a prerequisite to an award of attorneys' fees.

In an order issued after the second trial, the district court first declined to award attorneys' fees because it found no evidence in the record showing Taherzadeh in default under the lease. Appellees then filed a motion urging the court to grant attorneys' fees. On reconsideration, the district court found that the evidence demonstrated that Taherzadeh was in default under the lease. Although there was no jury finding on the issue of default, the district court made its own finding of default under the authority contained in Fed. R.Civ.P. 49(a).[10] The district court then

---

7. We may reverse a trial court's determination only upon a showing of "a clear abuse of discretion." *Lemon v. Bank Lines, Ltd.*, 656 F.2d 110, 116 (5th Cir.1981).

8. *See* the discussion of the conversion issue in Section III, *infra*.

9. Article 19.4 provided:
   If on account of any breach or default by Tenant in its obligations hereunder, Landlord shall employ an attorney to enforce or defend any of Landlord's rights or remedies hereunder, Tenant agrees to pay any reasonable attorneys' fees incurred by Landlord in such connection.

10. F.R.Civ.P. 49(a) provides, in pertinent part:
    The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact.... If ... the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issue so omitted unless before the jury retires he demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it

issued an order awarding $111,000 in attorneys' fees to appellees.

▇ Taherzadeh argues that the district court erred in making a Rule 49(a) finding on default. Counsel for Taherzadeh timely objected to the omission of his proffered issues concerning default from the charge.[11] If objection is made for failure to submit an issue, the district judge has no authority to make an express finding under Rule 49(a) concerning that same issue. See Wright and Miller, FED.PRAC. & PROC. § 2507 (1971). The district court, therefore, erred in making a Rule 49(a) finding concerning default.

▇ Nevertheless, the district court had authority to find default because default was established as a matter of law. The district court found several instances of default. The first was that Taherzadeh had breached the lease by sending his September, 1979 rent payment late. Taherzadeh's rent was due on September 1. Under paragraph 19.1 of the lease, a failure to pay the rent within ten days of the due date constitutes default.[12] Taherzadeh did not send the rent until September 18, and appellees received it on September 20.

▇ Taherzadeh's only defense was that appellees had waived timely payment of rent by consistently accepting late payments. The lease, however, provides that:

"One or more waivers of any convenant, term or condition of this lease by either party shall not be construed as a waiver of a subsequent breach of the same covenant, term or condition."

Under the controlling Texas law, this clause precludes the defense of waiver as a matter of law. *Giller Industries, Inc. v. Hartley*, 644 S.W.2d 183, 184 (Tex.Civ.App. —Dallas 1982, no writ).[13] Thus, there was no fact issue for the jury. Taherzadeh defaulted as a matter of law, and the award of attorneys' fees was proper.[14]

---

shall be deemed to have made a finding in accord with the judgment on the special verdict.

11. When the court asked for objections to the charge in the first trial, counsel for Taherzadeh replied as follows:

Mr. Oler: Plaintiff further objects to the charge for not including—plaintiff further objects to the court's refusal to submit the nine special issues and accompanying instructions which appear in plaintiff's exhibit number one to the charge conference, March 17, 1981 signed by Gayle Edward Oler as attorney for plaintiff, the contents of which are incorporated verbatim in this objection.

The nine special issues attached to plaintiff's exhibit one to the charge conference contained issues regarding default. These were the same issues of default which form the basis of the district court's Rule 49(a) finding. This objection was timely and was specific enough to prevent waiver of a jury finding on the issue of default by Taherzadeh. *See Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 424 (5th Cir.1985); *First National Bank, Henrietta v. Small Business Admin.*, 429 F.2d 280, 285 (5th Cir.1970).

12. Paragraph 19.1 of the lease provides, in pertinent part:

The following events shall be deemed to be events of default by Tenant under this lease: (1) Tenant shall fail to pay any installment of rent or any other obligation hereunder involving the payment of money and such failure shall continue for a period of ten days (2) Tenant shall fail to comply with any term, provision or covenant of this lease, *other than as described in subsection (1) above* and shall not cure such failure within fifteen days after written notice hereof to Tenant. (emphasis added).

The district judge found that subsection 2— which provides that the lessor will give written notice and opportunity to cure any breach of the contract *other than* non-payment of rent— operates as a waiver making written notice and opportunity to cure non-payment of rent not available to lessee to avoid a default.

13. Both *Giller* and the present case involved commercial tenancies. We express no opinion regarding whether such a clause is granted the same effect in a residential tenancy.

14. The other instances of default which the district court found were that Taherzadeh attempted to pay rent in October, 1979 with personal checks and there were insufficient funds from which to pay these checks; that Taherzadeh did not pay rent by October 10, 1979; and that Taherzadeh, after fifteen days written notice, failed to continue to operate his business and keep the premises open during periods of normal use as required by the lease. Because the late payment of rent in September, 1979 amounted to a default as a matter of law, it is unnecessary for us to consider whether these other defaults found by the district court amount to default as a matter of law.

### B. *Right to Offset*

█ Taherzadeh argues that, in any event, he was entitled to an offset credit against the attorneys' fees in the amount of additional rent collected by appellees when they relet the property. Paragraph 19.1(7b)(i) of the lease provides, in pertinent part:

> Any amount collected by Landlord from subsequent tenants for any calendar month, in excess of the monthly rentals *and other charges* provided in this lease, shall be credited to Tenant in reduction of Tenant's liability for any calendar month for which the amount collected by Landlord will be less than the monthly rentals *and other charges* provided in this lease. (emphasis added).

We find that paragraph 19.1(7b)(i) entitled Taherzadeh to the asserted offset credit. Paragraph 19.4 of the lease provides for award of attorneys' fees. Since such an award is a "charge" provided for in the lease, paragraph 19.1(7b)(i) allowed Taherzadeh to offset the increased rental which the landlord received from other tenants against that "charge."

Appellees dispute the assertion that the offset provision of paragraph 19.1(7b)(i) applies to attorneys' fees.[15] They argue that attorneys' fees are not considered "other charges" under the lease. However, the lease nowhere excludes attorneys' fees from being "other charges." Doubt as to the meaning of the language of a lease is to be resolved against the lessor. *Sirtex Oil Industries v. Erigan*, 403 S.W.2d 784, 788 (Tex.1966). We find that this provision authorizes an offset credit against the attorneys' fees. There is testimony in the

record that appellees relet the premises for more than Taherzadeh was paying. In view of our disposition, we must remand to the district court for an accounting to determine the proper amount of the offset.[16]

We also note that Taherzadeh should be given an additional credit of $6,841.66 against the award of attorneys' fees. Taherzadeh paid this amount for rent in September, 1979. This amount was paid to and accepted by appellees on September 20, 1979—subsequent to the date that appellees filed a sworn pleading in a forceable entry and detainer action stating that the lease had terminated.[17] Under Texas law, a landlord is estopped from collecting additional rentals after he has filed a sworn pleading terminating the lease. *Glasscock v. Console Drive Joint Venture*, 675 S.W.2d 590, 592–93 (Tex.Civ.App.—San Antonio 1984, no writ). Appellees stated at the time of acceptance of this money that they would keep the amount as partial payment against damages owed them by Taherzadeh. Accordingly, this $6,841.66 should also be offset against the award of attorneys' fees.

### III. CONVERSION

█ Taherzadeh contends that the district court erred in not submitting a jury interrogatory on the theory of conversion during the first trial. Taherzadeh introduced evidence that appellees removed restaurant equipment and furnishings from "La Truite." Taherzadeh, however, failed to object to the omission of an interrogatory concerning conversion from the charge at the time the charge was given to the jury. The failure to object would nor-

---

**15.** Appellees also argue that Taherzadeh has waived any right of offset because it was not pled. Taherzadeh, however, is not seeking affirmative relief here. Rather, he is merely attempting to insure that the attorneys' fees recovered by appellees are the proper amount under the lease. In this circumstance, Taherzadeh has not waived his right of offset. *See, e.g., Hutches v. Renfroe*, 200 F.2d 337, 341 (5th Cir.1952) ("[I]t is the duty of the court to grant the [proper amount of] relief to which the plaintiff is entitled, irrespective of the prayer for relief....").

**16.** We reject Taherzadeh's contention that he should be given an offset for the value of the property appellees seized from the restaurant. Since the property was never sold, this contention is actually a claim of conversion, and is dealt with in Section III, *infra*.

**17.** The parties also stipulated that a September 14, 1979 letter from appellees to Taherzadeh terminated the lease.

mally constitute a waiver of his right to a jury finding on the conversion issue. *J.C. Motor Lines v. Trailways Bus System*, 689 F.2d 599 (5th Cir.1982). Taherzadeh argues, however, that it was not necessary to object formally on the record because counsel had already "made clear to the court that he believed the issue should be included in the charge and the court had made plain that it had already decided the issue and any further objection would be unavailing." Such an exception to the requirement of an objection is recognized. *See Industrial Dev. Bd. of Town of Section, Alabama v. Fuqua Industries*, 523 F.2d 1226, 1238 (5th Cir.1975). The record, however, does not support Taherzadeh's claim that the district court had already decided the issue and further objection would have been unavailing. The district judge never stated on the record that he would not include a conversion issue in the jury charge.[18]

In the absence of a demand by the parties that an issue be submitted, and if such issue is omitted, F.R.Civ.P. 49(a)[19] allows the Court to make its own findings on the omitted issue. *See J.C. Motor Lines*, 689 F.2d at 602. In this case, the district judge found that appellees were not liable for conversion to Taherzadeh because Taherzadeh neither owned the property nor had a right to immediate possession. That finding is reviewable under the "clearly erroneous" standard of F.R.Civ.P. 52(a). *Id.*

■ Taherzadeh did not own the property which he contends was converted. Rather, Taherzadeh based his claim of conversion solely upon his right as a lessee to possess the property. Because the lease provides a security interest in the property to the landlord, the district court held that Taherzadeh lost his right to immediate pos-session of the property when he defaulted under the lease.[20] As noted above,[21] default was established as a matter of law. Without a right to immediate possession, Taherzadeh had no claim for conversion. *Gardner v. Jones*, 570 S.W.2d 198, 201 (Tex.Civ.App.—Houston [1st Dist.] 1978, no writ) (If plaintiff does not have title to the property, he must have the right to immediate possession in order to have claim for conversion).

Taherzadeh argues additionally that appellees waived their landlord's lien, or alternatively, if they did not waive their lien, they never properly enforced their lien because they did not sell the property. Appellees respond that they never waived their lien, but merely subordinated the lien to a lien held by the bank. Appellees also urge that Taherzadeh is in no position to complain that the lien was not properly enforced because he never made a proper demand for the property, and appellees never refused to tender the property. Finally, appellees contend that much of the property consisted of fixtures and permanent improvements which became the landlord's property under the lease.

All of these questions were disputed factual issues. The district judge made a Rule 49(a) finding for appellees on the conversion claim. Under Rule 49(a), the district judge is deemed to have resolved all of these issues in favor of appellees. There was ample evidence to support a finding in favor of appellees on these issues. We conclude that the district court's ruling on conversion is not clearly erroneous.

## CONCLUSION

We hold that Taherzadeh is entitled to a credit against the attorneys' fees in the

---

18. In fact, the discussion which Taherzadeh claims indicates the judge's unwillingness to include the conversion charge establishes just the opposite:

   The judge said: I'm not—*I'm not prepared finally to rule on it,* I think probably it's well-taken that if you do intend—you do indeed have the right to immediate possession, that is a sufficient ownership interest to be subject to conversion. That's one of the issues here.

19. *See* note 10 and accompanying text, *supra.*

20. Paragraph 20.1 of the lease gave the landlord a security interest in property of the tenant situated on the premises to secure payment in event of tenant default.

21. Section II, *supra.*

amount of higher rents collected by appellees when they relet the property, plus the $6841.66 which Taherzadeh paid in September, 1979. We reverse and remand to the district court for the entry of judgment in accordance with these conclusions.

REVERSED AND REMANDED.