Betsy Ann SWENTEK,
Plaintiff-Appellant,

v.

USAIR, INC.; Jon R. Ludlam,
Defendant-Appellee,

Women's Legal Defense Fund,
Amicus Curiae.

Betsy Ann SWENTEK,
Plaintiff-Appellee,

v.

Jon R. LUDLAM, Defendant-Appellant,

USAIR, Inc., Defendant-Appellee,

Women's Legal Defense Fund,
Amicus Curiae.

Nos. 86–2589(L), 86–2614.

United States Court of Appeals,
Fourth Circuit.

Argued May 6, 1987.
Decided Oct. 7, 1987.

Francine K. Weiss (Edith Barnett, on brief) for appellant.

Brian William Shaughnessy (Shaughnessy, Borowski & Gagner, on brief), Gregory S. Lewis (Morgan, Lewis & Bockius, Washington, D.C., Thomas Rawles Jones, Jr., Moffit & Jones, Alexandria, Va., on brief), for appellees.

Sonia A. Jarvis, Donna R. Lenhoff, Women's Legal Defense Fund, Terry Bancroft Dowd, Kevin C. Dwyer, B. Lee Willis, Miller & Chevalier, Chartered, Washington, D.C., on brief, for amicus curiae Women's Legal Defense Fund.

Before PHILLIPS, ERVIN, and WILKINSON, Circuit Judges.

WILKINSON, Circuit Judge:

Betsy Ann Swentek, a flight attendant, sued her employer, USAIR, alleging sexual harassment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* In the same action, she brought pendent state claims of intentional infliction of emotional distress, assault and battery, and invasion of privacy against USAIR and against Jon Ludlam, a USAIR pilot. The trial judge found against Swentek on the Title VII claim, and the jury found for her only on the claim of emotional distress. The trial court then set aside that verdict and ordered a new trial. A second judge subsequently granted Ludlam's motion for a directed verdict on the emotional distress claim as well. From these various rulings, Swentek appeals.

I.

The facts of this case are much in dispute. In fact, they are wildly at variance. We trace with some reluctance the tortured history of animosity between the principals, and the various acts in which each is alleged to have been involved.

Appellant Betsy Ann Swentek has worked as a USAIR flight attendant for

over 16 years. Jon Ludlam has been a USAIR pilot for almost 20 years. Swentek was assigned to work with Ludlam for a three-day period covering July 28, 29, and 30, 1984. After this trip, Swentek filed a complaint against Ludlam with USAIR's Manager of Flight Attendant Services.

The complaint alleged that during the trip, Ludlam interrupted a conversation between Swentek and a customer service agent with an obscene comment about the agent's wife; embarrassed her in front of an FAA official with a non-sexual prank; disparaged her age and weight; jumped up in her presence on the registration desk at a hotel in Newark to "check out" the legs of the female registration clerk; and exposed himself to her by dropping his trousers. The complaint also contained her allegation, as explained at trial, that Swentek began to cry during the trip and told Ludlam, "I don't have to take this from you and I won't." He allegedly replied, "I haven't even started on you yet." The complaint was accompanied by the sworn statements of two other flight attendants who witnessed these events.

Swentek also alleged in her complaint that, during the preceding month of June, Ludlam reached under the skirt of her uniform and grabbed her genitals during a chance meeting in a stairwell at the Pittsburgh airport. She claimed that she did not immediately report the incident because she was humiliated and afraid and because Ludlam said that he would thereafter "be a good boy."

Swentek brought a claim for sexual harassment under Title VII and pendent state claims of intentional infliction of emotional distress, assault and battery, and invasion of privacy. She sought equitable relief and over $1 million in damages.

The state tort claims were tried before the jury. Swentek testified that Ludlam made numerous obscene comments during the July trip,[1] and threatened to delay her pay by withholding her name from a flight log book. She further testified that Ludlam made obscene comments to her before the July trip when they happened to meet.[2] According to appellant, Ludlam dropped to his knees and sniffed her when he was first introduced to her during a crew change on a DC-9. Swentek said that she told Ludlam to leave her alone after each of these encounters.

Much testimony was also devoted to Ludlam's taunting remarks about Swentek's off-duty attire, to his tone of voice when he said "Hello, Swentek" at a party, and to his alleged attempt to block her way through some doors in an airport. She further testified that, shortly before trial, a pilot approached her as she was registering in a Toronto hotel, grabbed her breasts and said "this is a greeting from Jon Ludlam."

In addition to these allegations, Swentek attributed to Ludlam obscene phone calls that she allegedly received at her home beginning in late 1983 and continuing through the litigation of this lawsuit. She claimed that she recognized Ludlam's voice as that of the caller.

Ludlam emphatically denied that any of these incidents happened. At trial, he rebutted many of Swentek's allegations with eyewitness testimony and with flight records which showed that he was not in Swentek's vicinity when the incidents allegedly occurred. An eyewitness to the alleged pants-dropping incident testified that Ludlam was simply tucking in his shirt. The personnel on the July trip testified that Swentek did not seem upset or hostile toward Ludlam during the trip and that Ludlam did not seem to be harassing her. According to Ludlam, this suit is the result of personal animosity over Swentek's threat to sue another flight attendant. Various witnesses testified that Swentek

---

1. She claims, for example, that Ludlam sang obscene limericks to her and the rest of the crew during a limousine ride. She alleges that he also told her during the flight that he could tell when the cabin temperature was too low by looking at her nipples, and that "girls with big breasts usually have ugly nipples."

2. Allegedly, on separate occasions during a nine month period, Ludlam told Swentek she was "an outstanding snatch," called her a "cunt," and said "I wish I were a coat so I could wrap myself around your big tits."

told them that she intended to get Ludlam fired.

In addition, numerous witnesses described Swentek as a vindictive person who often threatened her coworkers with lawsuits for real or imagined personal slights. The two flight attendants who signed statements corroborating the events of the July trip recanted their statements at trial, stating that they had signed them merely to appease Swentek and to avoid any trouble with her. There was also testimony that Swentek was a foul-mouthed individual who often talked about sex. In addition, unrebutted testimony at the first trial revealed that Swentek placed a "dildo" in her supervisor's mailbox to get her to "loosen up," urinated in a cup and passed it as a drink to another employee, and once grabbed the genitals of pilot Don Matthews with a frank invitation to a sexual encounter. At the second trial, Swentek denied doing any of these things.

After the jury retired to consider the tort claims, the trial judge heard USAIR's case on the Title VII claim. USAIR's Regional Director of Flying, Captain James Sullivan, testified that he investigated Swentek's complaint and issued a letter of reprimand to Ludlam. Sullivan told Ludlam that he would be suspended if any more complaints were received. Sullivan also testified that he informed Swentek of this action. Swentek claims that she was not notified of it. Swentek then filed an EEOC charge which was investigated internally by a senior attorney in USAIR's legal department. The attorney determined that the charge lacked merit because Ludlam had ceased his foul language since his reprimand and no new complaints had been received. After receiving a right-to-sue letter, Swentek instituted this action.

After the evidence was in, but before final arguments, Swentek moved to amend her complaint to include punitive damages. Despite Ludlam's vigorous objection, the judge granted the motion. The jury held for Swentek on the emotional distress claim, awarding her $10,000 in compensatory damages and $10,000 in punitive damages. It held against her on the assault and battery and invasion of privacy claims.

After the jury returned its verdicts, Judge Cacheris held for USAIR on the Title VII claim. He specifically found that the Pittsburgh grabbing incident did not occur, that Ludlam was not responsible for the obscene phone calls, and that he did not drop his pants, drop to his knees, or make many of the rude, sexually suggestive comments attributed to him. The judge did find that Ludlam used some foul language and sang lewd limericks in Swentek's presence. He held for USAIR, stating that Ludlam's conduct was not severe or pervasive enough to constitute harassment under Title VII and that Swentek's own conduct indicated that Ludlam's behavior was "not unwelcome." He also found that Ludlam was not Swentek's supervisor and that USAIR took corrective action against Ludlam when it received complaints about him.

Swentek moved for a new trial on her state law claims, alleging that the trial judge erred in admitting evidence of her past sexual behavior. Ludlam moved for a new trial on the emotional distress claim, alleging that he was unfairly prejudiced by Swentek's late amendment of her complaint to include punitive damages. Judge Cacheris, noting that he had "painted himself into a corner" by making credibility findings in ruling on the Title VII claim, granted Ludlam's motion for a new trial on the emotional distress claim and recused himself from the second trial.

At the new trial, Judge Hilton held that Swentek was collaterally estopped by the jury verdicts on assault and battery and invasion of privacy from submitting evidence of the Pittsburgh grabbing incident or the obscene telephone calls. He found that Swentek failed to prove any intent by Ludlam to harass her, and that the conduct alleged was not severe enough to make out an emotional distress claim. He directed a verdict for Ludlam.

Swentek now appeals. She argues that Judge Cacheris erred in holding against her on the Title VII claim, and that he abused his discretion in setting aside the jury's

verdict on emotional distress. She also asserts that the judge erred in failing to order a new trial on the assault and battery and the invasion of privacy claims. Further, she challenges the collateral estoppel effect accorded to the jury's verdicts on those claims at the second trial. Finally, she asserts that Judge Hilton at the second trial erred in directing a verdict for Ludlam.

## II.

We first address Swentek's appeal of the district court's ruling in favor of USAIR, the only defendant in the Title VII case. She claims that the harassment of her was severe and pervasive, that she did not welcome Ludlam's conduct and that USAIR is liable for Ludlam's conduct under traditional agency principles. We affirm the Title VII holding, though we do not adopt the reasoning of the district court in all respects.

■ In *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Supreme Court recognized a cause of action under Title VII for persons forced to work in an environment where sexual harassment has created a hostile or abusive atmosphere. *Accord Katz v. Dole,* 709 F.2d 251 (4th Cir.1983). To prove such a claim, the plaintiff must show that the conduct in question was unwelcome, that the harassment was based on sex, and that the harassment was sufficiently severe or pervasive to create an abusive working environment. *Henson v. City of Dundee,* 682 F.2d 897, 903–04 (11th Cir.1982). The plaintiff must also show some basis for imposing liability on the employer. *Id.* at 905; *Katz,* 709 F.2d at 254.

■ We note at the outset that the trial court misconstrued what constitutes unwelcome sexual harassment. It held that Swentek's own past conduct and use of foul language meant that Ludlam's comments were "not unwelcome" even though she told Ludlam to leave her alone. In his oral opinion, the judge determined, not that Swentek welcomed Ludlam's comments in particular, but that she was the kind of person who could not be offended by such comments and therefore welcomed them generally. We think that was error. Plaintiff's use of foul language or sexual innuendo in a consensual setting does not waive "her legal protections against unwelcome harassment." *Katz,* 709 F.2d at 254 n. 3. The trial judge must determine whether plaintiff welcomed the particular conduct in question from the alleged harasser.

This view is in accord with the Supreme Court's decision in *Vinson.* There, the Court held that evidence of the plaintiff's provocative speech and dress was relevant in determining whether she welcomed sexual advances from her supervisors. *Id.* at 2407. Unlike this case, however, the evidence of Vinson's past conduct bore directly on her contact with the alleged harasser. Vinson worked with her supervisor daily, and her dress and conversation were relevant in determining whether she welcomed sexual advances from him. By contrast, there was no evidence in this case that Ludlam knew of Swentek's past conduct or that he believed his conduct was welcomed by her. In fact, she says that she told him that his conduct was not welcome. Under these circumstances, it was improper for the trial judge to suggest that Swentek's past conduct meant that she welcomed Ludlam's behavior.

The district court's alternative ground of decision—that there was no basis for employer liability—is, however, a sound one. The standard of employer liability applicable to sexual harassment cases is a matter of debate. In *Vinson,* the Court suggested an application of traditional agency principles in determining when an employer is liable for the acts of its employees. It stated that supervisory status would not automatically result in liability. At the same time, the absence of notice to an employer does not necessarily insulate that employer from liability. *Vinson,* 106 S.Ct. 2408.

■ We decline to disturb the district court's finding that Ludlam was not Swentek's supervisor. Ludlam did not exercise corporate authority as an instrument for

harassment. Hence, the usual indicia of an agency relationship were not present. USAIR did delegate responsibility to Ludlam for the safety of his passengers and crew on the aircraft, but Swentek does not allege actionable harassment perpetrated in the exercise of that responsibility.[3] Ludlam had very limited authority over Swentek. Pilots and flight attendants are attached to different administrative departments within USAIR and perform under different supervisory chains of command. Pilots do not hire, fire, promote, or demote flight attendants; they do not determine their work assignments. The relationship described here is more one of bickering between coworkers.

Under these circumstances, where the Title VII claim is one of a hostile sexual environment, *Vinson* does not require us to depart from the standard of employer liability that we set out in *Katz*. The employer is liable where it had "actual or constructive knowledge of the existence of a sexually hostile working environment and took no prompt and adequate remedial action." In establishing the employer's knowledge, the plaintiff may show that "complaints about the harassment were lodged with the employer or that the harassment was so pervasive that employer awareness may be inferred." *Katz*, 709 F.2d at 255.

Here, Swentek failed to establish USAIR's liability. When she complained of harassment, USAIR responded. After receiving the complaint, the Manager of Flight Attendant Services, Joseph Spezza-

no, passed it along to the Director of Flying, James Sullivan, who has jurisdiction over pilots. Captain Sullivan reviewed the complaint and ordered Ludlam into his office to discuss the matter in the presence of Ludlam's union representative. Sullivan confronted Ludlam with the complaint and questioned him about the allegations. Ludlam admitted to some unprofessional language and conduct, but denied that he had ever grabbed Swentek or dropped his trousers. Captain Sullivan credited Ludlam's denials. He testified to his belief that if the grabbing incident had actually occurred, Swentek would have complained more promptly. He also interviewed other employees, seeking corroboration of Swentek's complaint.

Pursuant to USAIR's progressive discipline policy, Sullivan issued a written warning to Ludlam to refrain from using foul language and told him to keep away from Swentek.[4] He also informed him that a suspension would follow another substantiated complaint about his language. USAIR then monitored Ludlam's conduct for improvement. After this reprimand, no further complaints were lodged against him.

In taking remedial action, USAIR was obliged to investigate Swentek's charges and to present a reasonable basis for its subsequent actions. It was not, however, required to credit all of Swentek's allegations in order to escape liability. In view of the allegations in this case, USAIR's written warning was adequate. We there-

---

**3.** Two of the alleged incidents occurred during the exercise of authority conferred on Ludlam by USAIR. Swentek alleged that Ludlam made an obscene comment to her when she asked him to adjust the cabin temperature, a duty delegated to Ludlam by USAIR. In addition, Swentek alleged that Ludlam once threatened to delay her pay by withholding her name from the flight log because she told him that she "didn't want to put up with his nonsense." These are only two of myriad allegations in this case and represent isolated occurrences. Ludlam had no authority to dock her pay, and Swentek had adequate correctives at her disposal. The allegations are insufficient to state a claim under Title VII.

**4.** The progressive discipline policy is a feature of the collective bargaining agreement between USAIR and the pilots' union. It requires an oral warning for the first instance of misconduct, followed by a written warning, a suspension, and then termination. In this case, the evidence showed that in November, 1983, a flight attendant complained to Spezzano that Ludlam used foul language during a limousine ride between airports. Spezzano relayed this complaint to the Director of Flying, Henry Nash. Nash instructed Sullivan, then a "check pilot", to speak to Ludlam. During a "check flight," Sullivan told Ludlam about the complaint and to refrain from such conduct. Ludlam said he would. This exchange was noted as an oral warning in Ludlam's personnel file.

fore affirm the trial judge's ruling denying Swentek relief under Title VII.[5]

### III.

Swentek next argues that the district court erred in ordering a new trial on her emotional distress claim. She complains that the trial judge deprived her of the Seventh Amendment right to a jury by failing to conform his equitable findings on the Title VII claim to the jury's verdict on the emotional distress claim. We disagree.

 Trial judges are encouraged, in the interest of uniformity and respect for jury fact finding, to conform their equitable findings to a jury's verdict when the verdict actually and necessarily determines issues common to both claims, *see Hunter v. Allis-Chalmers Corp.*, 797 F.2d 1417, 1421 (7th Cir.1986). This rule is not ironclad, however. *See Ritter v. Mount St. Mary's College*, 814 F.2d 986 (4th Cir.1987). The Seventh Amendment does not require the trial judge to conform his findings to a jury verdict that is infirm.

 In this case, the trial court set the verdict aside based in part on his own credibility determinations. This was proper; in assessing the need for a new trial, the trial judge "may weigh the evidence and consider the credibility of the witnesses" to assess whether the verdict will result in a miscarriage of justice. *Wyatt v. Interstate & Ocean Transport Co.*, 623 F.2d 888, 891 (4th Cir.1980). This is not a discretionary task, but a duty, as our cases have repeatedly emphasized. *Gill v. Rollins Protective Services Co.*, 773 F.2d 592, 595 (4th Cir.1985); *Wyatt, supra,* at 891–2. The duty does not disappear in a case with an equitable claim where the judge is a fact finder. So long as the jury verdict has been set aside, not from mere differences of opinion, but as against the clear weight of the evidence, the trial judge will be sustained.

The trial court did not abuse its discretion in setting aside the verdict and ordering a new trial on the emotional distress claim. The defendants denied, and in many instances, rebutted nearly all of Swentek's claims. For example, Swentek's charge that Ludlam dropped to his knees during a crew change on a DC–9 was rebutted on the grounds that Ludlam was not licensed to fly a DC–9 at the time the incident occurred. Swentek's claim that he "exposed himself" to her was rebutted by an eyewitness who testified that she and Swentek came upon Ludlam by surprise as he was tucking in his shirt. Several witnesses testified that Ludlam was in no way menacing or sarcastic when he said, "Hello Swentek" at the party, and that he did not, as Swentek alleged, block her way through a doorway. There was also extensive testimony that Swentek did not appear to be upset during the July trip which she claimed was a nightmare. In addition, there was documentary evidence that Ludlam was not even in the Pittsburgh airport when the grabbing incident allegedly occurred; there were no telephone calls charged to Swentek on Ludlam's phone bills; there were inexplicable delays in reporting incidents over which Swentek professed to be incensed.

In setting aside the verdict, the trial judge determined that many of the acts attributed to Ludlam did not occur, were not intended to distress, or were trivial and isolated incidents. In addition, he found that the proceedings were prejudiced by his failure to give defendant Ludlam an opportunity to argue against his decision to allow plaintiff to seek punitive damages after the trial was completed. Under these circumstances, we cannot say that the trial judge abused his discretion in ordering a new trial on the emotional distress claim.

---

**5.** In the first trial, Ludlam counterclaimed against Swentek for intentional interference with contractual relations. The jury found for Swentek on that claim. Later in the proceedings, Swentek "counterclaimed" against Ludlam, alleging under Title VII that Ludlam's counterclaim against her was retaliatory. The trial court dismissed Swentek's retaliation claim. Ludlam then moved for attorneys' fees, arguing that the retaliation claim was frivolous. The court found that Swentek's Title VII claims were not frivolous and denied the motion for attorneys' fees. Finding no abuse of discretion, we affirm.

For the same reasons, we conclude the new trial on emotional distress was properly not limited to damages alone.

### IV.

Swentek also challenges the second trial judge's failure to order a new trial on her assault and battery and invasion of privacy claims. She contends that it would be an injustice to try these claims separately from the emotional distress claim because all three claims are bound together factually.

A partial new trial is permissible where the issue to be retried is distinct and separable from the other claims in the case. *Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494, 500–01, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931); *Atlantic Coast Railroad v. Bennett*, 251 F.2d 934, 938 (4th Cir.1958). A trial judge's decision to grant a partial new trial may be reversed only for a clear abuse of discretion. *Lemon v. Bank Lines*, 656 F.2d 110, 116 (5th Cir.1981). Here we think that discretion was properly exercised to prevent the relitigation of discrete claims that prior jury verdicts had already resolved.

Unlike the emotional distress count, which served as a "catch-all" for alleged affronts and insults of all kinds, the assault and battery and invasion of privacy claims rested on discrete factual allegations. *See Taherzadeh v. Clements*, 781 F.2d 1093, 1097 (7th Cir.1986) (partial new trial proper where jury's specific factual findings are clear). The invasion of privacy claim was based solely on Swentek's allegation that Ludlam made obscene phone calls to her home. Swentek failed to offer any evidence that Ludlam was the source of these calls, and the jury found against her on that count. The only reasonable conclusion is that the jury believed that Ludlam did not make the phone calls.

Similarly, the assault and battery claim arose primarily from Swentek's allegation that Ludlam grabbed her in the genital area as she walked up a flight of stairs in the Pittsburgh airport. The trial judge so instructed the jury. Nonetheless Swentek claims the jury included the grabbing inci-

dent in the emotional distress award, but held against her on assault and battery to prevent a "double recovery." She also speculates that, because the district court improperly admitted evidence of her own sexually-oriented past conduct, the jury could have concluded that the grabbing incident occurred but that Swentek was not offended by it.

It is far more likely, however, that the jury held against appellant on the assault and battery claim because it, like the trial judge, determined that the grabbing incident at the heart of that claim never happened. That incident is Swentek's most serious allegation against Ludlam. The jury cannot have believed that appellant was sufficiently distressed to hold for her on emotional distress, and, at the same time, believed that she was not offended by a grabbing of her private parts. If the jury believed that the grabbing incident happened, it certainly would have held for her on the assault and battery claim and fashioned its damage award accordingly. Because the assault and battery claim was grounded on a discrete factual allegation that the jury found did not occur, the trial court did not abuse its discretion in failing to order a new trial on assault and battery.

### V.

Swentek's next contention—one closely related to the partial new trial question—is that the second trial judge erred in collaterally estopping her from offering any evidence of the grabbing incident or the obscene phone calls at the second trial on the emotional distress count. Swentek argues that collateral estoppel is inappropriate in this case because the jury's and trial judge's findings in the first trial were not final judgments and that the estopped issues were not actually or necessarily determined in the first trial. We disagree on both points.

Swentek's view of the matter would encourage an unfortunate application of Fed. R.Civ.P. 54(b). Rule 54(b) states that the court may direct the entry of a final judgment on fewer than all claims in a suit only

by an express direction for entry of judgment and an express determination that there is no just reason for delaying the entry of judgment. The purpose of Rule 54(b) is to protect against piecemeal appeals when multiple claims are resolved during the course of a single lawsuit. The trial judge's technical compliance with Rule 54(b) signals his determination that an appeal of a single issue is timely.

■ We do not think the trial judge was required to direct entry of judgment under Rule 54(b) and await the appeal of Swentek's privacy and battery claims before assigning the prior jury determinations preclusive effect. Such a course would dictate the very piecemeal appeals—with all the attendant drain on resources—that Rule 54(b) was designed to prevent.

■ Rather, we think it was within the discretion of the trial court to inquire at the partial new trial whether the parties had a full and fair opportunity to litigate the particular matter. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). Collateral estoppel is appropriate where the identical issue was "actually litigated, that is, contested by the parties and submitted for determination by the court," where the issue was "actually and necessarily determined by a court of competent jurisdiction," and where preclusion does not work an unfairness in the second trial. *Otherson v. Department of Justice*, 711 F.2d 267, 273 (D.C.Cir.1983). As long as the prior adjudication of the identical issue is conclusive, we see no reason to require the issue to be tried again because it lacked the formality of an express order and a "no just reason for delay" determination. *See Alexander v. Chicago Park District*, 773 F.2d 850, 855 (7th Cir.1985); *O'Reilly v. Malon*, 747 F.2d 820, 823 (1st Cir.1984); *Chemetron Corp. v. Business Funds, Inc.*, 682 F.2d 1149, 1191 (5th Cir.1982) *vacated on other grounds*, 460 U.S. 1007, 103 S.Ct. 1245, 75 L.Ed.2d 476 (1983). Finality for purposes of collateral estoppel is a flexible concept and "may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again." *Lummus Co. v. Commonwealth Oil Refining Co.*, 297 F.2d 80, 89 (2d Cir.1961); *Restatement (Second) of Judgments* ¶ 13 (1982).

When a trial court thus declines to enter judgment under Rule 54(b) and assigns preclusive effect to prior determinations in a partial second trial, both the merits of the initial determinations and the assignment of preclusive effect will, of course, be subject to review upon appeal of the final judgment order, here the directed verdict in the second trial. The trial judge must thus weigh carefully the advantages of avoiding piecemeal appeals against the prospect that an appellate court may eventually find error that will cause a great amount of trial work in the earlier proceeding to be redone. In this case, we have affirmed the critical rulings at the first trial,[6] and we believe

---

**6.** Among the assignments of error at the first trial, Swentek takes issue with the jury instruction on the assault and battery claim. At the charge conference, Swentek "expressed concern" that the assault charge should include a *reasonable fear of an offensive touching* rather than a reasonable fear of a physical injury. The trial judge responded that he covered this concern in the battery instruction by defining battery as an "offensive touching no matter how slight." There was no further discussion of the matter, although the trial judge later noted that "anything I didn't give you, you're preserved." Appellant's counsel did not express any further concern after the trial court's comment. Certainly there was no objection to the charge as given.

Swentek's real objection, however, is the entire structuring of the assault and battery charge. She claims on appeal that it was error for the trial judge to combine the assault and battery claims into one charge. She contends that the jury could have held against her on her assault and battery claim because it believed that it could not find for her on battery unless it also found an assault, *i.e.*, that she was in fear of a physical injury.

Swentek offered no objection to the combined structuring of the charge at trial. The trial judge, without objection from Swentek, informed the jury that the heart of the assault and battery claim was the Pittsburgh grabbing incident (and, to a much lesser extent, Ludlam's blocking the doorway at a party which allegedly caused battery by way of brushing). The Pittsburgh incident did not involve an assault at all. According to appellant's own testimony, the alleged grab at the Pittsburgh airport was a complete surprise without time for fear or apprehension. Thus, even if assault was defined as a

further that the trial judge's rulings on collateral estoppel should not be overturned. Swentek had every incentive to vigorously argue the invasion of privacy and assault and battery claims at the first trial. Although it is impossible to determine which specific factual issues were resolved by the jury's verdict on the emotional distress claim, the verdicts on assault and battery and invasion of privacy conclusively decided the factual issues excluded in the second trial. As we explained in the preceding section, we decline to deprive the doctrines of preclusion of their necessary force by adopting Swentek's highly speculative theory. Two triers of fact—the jury in its verdict on the state law claims and the judge in his findings on the Title VII claim—found that the facts underlying these counts did not occur. There was no reason to relitigate these issues.

## VI.

Finally, we turn to Swentek's contention that the district court in the second trial erred in directing a verdict for Ludlam at the close of Swentek's evidence. Here we agree with Swentek and reverse the grant of the directed verdict in this case.

To prove her claim for intentional infliction of emotional distress, Swentek had to show that Ludlam's conduct was intentional or reckless, that it was extreme and outrageous in that it offended generally accepted standards of decency and morality, that she suffered severe emotional distress, and that there was a causal connection between the conduct and her distress. *Womack v. Eldridge*, 215 Va. 338, 210 S.E. 2d 145, 148 (1974). The trial judge, in directing the verdict at the close of Swentek's case, held that her allegations, even if credited, were not sufficiently outrageous to make out a claim. The court noted that

Ludlam's sexual banter was "the kind of conduct that everybody at USAIR was engaged in," that it was not intended to harass Swentek, and that, while "bad manners," it was "not intolerable to the point that it offends the generally accepted standards of decency and morality."

■ We agree with the trial court that claims of bad manners, rude behavior and hurt feelings do not state a claim for emotional distress. The workplace is not a Victorian parlor, and the courts are not the arbiters of its etiquette. In this case, however, plaintiff claimed something beyond the ordinary run of insult and offense which people are expected to encounter. Swentek alleged that for several years Ludlam seized every opportunity to upset her with sexually abusive language and conduct. According to Swentek, he made repeated reference to her private parts, sought her out in airports and hotels in order to make obscene comments, fell to his knees in a sexually suggestive way when they first met, dropped his pants in her presence and engaged his friends in sexually molesting behavior. She claims to have lived in fear of him. When she complained of his abuse, he is alleged to have told her, "I haven't even started on you yet." While the exaggerated nature of some of Swentek's claims seems apparent from the transcript, so does the pointed crudeness of some of Ludlam's behavior. Swentek's allegations may reflect nothing more than a personal feud of excessively puerile proportions, or they may establish a campaign of sustained cruelty and harassment. We cannot be sure, and we believe the directed verdict was premature in this instance.

We recognize that *Ritter v. Mount Saint Mary's College*, 814 F.2d 986 (4th Cir.1987),

---

fear of an offensive touching, Swentek's evidence did not prove an assault. The evidence was directed at a battery, and the trial court's instruction drew the attention of the fact-finder to the offensive aspect of the touching. Swentek's claim that she was constantly anxious and apprehensive goes to emotional distress, not to a three-year long "assault."

Swentek also claims that she was entitled to a new trial on her state tort claims because the

trial judge's refusal to exclude evidence of her past conduct unduly prejudiced the jury. The trial judge in this case, however, determined that the evidence of Swentek's sexual behavior was relevant to her claim that she was severely distressed by Ludlam's foul language and other conduct, and was admissible under Fed.R.Evid. 404(a) and 403. In doing so, he did not abuse his discretion.

generally requires that equitable findings receive preclusive effect in a subsequent action at law. That salutary rule, however, does not properly apply in these narrow circumstances. Judge Cacheris granted Swentek a new trial on emotional distress; for all the infirmities in her case, he stopped short of entering judgment n.o.v. It would be anomalous to have a judge's award of a new jury trial nullified by the equitable findings of the same judge who ordered it. *Ritter* emphasized that the application of collateral estoppel remains subject to considerations of fairness. *Id.* at 994. We believe it would be unfair—and quite contrary to Judge Cacheris' intent in granting the new trial—to hold the Title VII findings binding on the emotional distress claim upon remand.

## VII.

In sum, we affirm the Title VII ruling in favor of USAIR. We affirm the decision of the district court to set aside the verdict on emotional distress and to grant a new trial as to that count. We also think the district court acted within its discretion in excluding the invasion of privacy and assault and battery claims from the second trial and in holding Swentek collaterally estopped from introducing evidence on the alleged grabbing at the Pittsburgh airport and the alleged obscene phone calls. We reverse, however, the directed verdict in Ludlam's favor at the second trial and remand for further proceedings in accordance with this opinion.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.

