**Anne E. SPENCER, Plaintiff,**

v.

**GENERAL ELECTRIC CO. and James Russell Neal, Defendants.**

Civ. A. No. 87–1214–A.

United States District Court, E.D. Virginia, Alexandria Division.

Oct. 4, 1988.

Jane Lang McGrew, Weissbrodt, Swiss & McGrew, Paul C. Sprenger, Sprenger, Olson & Shutes, Washington, D.C., for plaintiff.

Bernard J. DiMuro, Philip J. Hirschkop, Hirschkop, DiMuro & Mook, Alexandria, Va., for Neal.

Peter G. Nash, Ogletree, Deakins, Nash Smoak & Stewart, Washington, D.C., C. Richard Miserendino, Fairfax, Va., for G.E.

## MEMORANDUM OPINION

ELLIS, District Judge.

This is yet another of the lamentably growing number of cases involving sexual harassment in the workplace. Alleged assaults and harassing conduct over an extended period gave rise to multiple claims. Specifically, plaintiff, Anne Spencer, a General Electric (GE) employee, brought suit alleging that her former supervisor, James Neal, sexually harassed and assaulted her over a three-year period and raped her in October, 1986. Against Neal, Spencer alleged state tort claims for assault and battery and intentional infliction of emotional distress. These same torts were alleged against GE on grounds of respondeat superior and ratification of Neal's acts. Against GE, Spencer also brought state tort claims for negligent supervision and failure to provide a safe workplace. Finally, Spencer asserted a Title VII, 42 U.S.C. §§ 2000e *et seq.*, sexual harassment claim against GE on both hostile environment and *quid pro quo* grounds.

Against Spencer's array of claims, defendants aimed a flurry of eleventh hour pretrial motions. Some claims fell. Claims against GE for negligent supervision and failure to provide a safe workplace were

dismissed; neither claim is cognizable under Virginia law.[1] The Court held, however, that GE could be liable for Neal's alleged acts under the doctrine of respondeat superior. *See Spencer v. General Electric,* Civil Action No. 87–1214–A (E.D.Va. May 24, 1988) (unpublished Order). The Court further held that Spencer's suit was not barred by the exclusivity provision of the Virginia Worker's Compensation Act, Va.Code Ann. § 65.1–23 (1987), because of the allegations that Neal committed intentional torts with the intent to injure her. *Id.; see also McGreevy v. Racal–Dana Instruments, Inc.,* 690 F.Supp. 468 (E.D.Va.1988) (adopting intentional tort exception to the Virginia Worker's Compensation Act).

This matter then proceeded to trial on Spencer's claims under state tort law and Title VII. The Court denied defendants' motion to try separately the tort claims and Title VII claims. At the conclusion of Spencer's case in chief, the Court granted GE's motion for a directed verdict on the state tort claims on the ground that plaintiff had not made out jury issues on the two essential questions: (1) whether Neal's alleged acts occurred within the scope of his employment and (2) whether GE ratified the alleged acts of assault, rape and harassment. The Court, in essence, found that the evidence provided no basis for holding GE liable for Neal's acts. At this point, given the demise of her state claims against GE, Spencer elected to request a nonsuit on her state claims against Neal and proceed solely on her Title VII claim. The Court granted this request and, after excusing the jury, completed the trial of the Title VII claim. It is Spencer's Title VII claim that is the subject of this Memorandum Opinion.

**1.** *See Chesapeake & Potomac Tel. Co. v. Dowdy,* 235 Va. 55, 365 S.E.2d 751, 754 (1988).

**2.** The Court's findings, made pursuant to Rule 52, Fed.R.Civ.P., are gleaned from the trial of this case, which took place over a period of eight days, from Monday, May 23, 1988, to Friday, June 3, 1988. Twenty witnesses testified, including three experts.

## FINDINGS OF FACT[2]

### A. *Introduction*

Spencer is a 41–year–old female who was hired by defendant GE as a Graphics Specialist in June, 1983. She was assigned to work in a group engaged in classified endeavors for the government. After obtaining a required security clearance, she reported for duty in January, 1984. She filed the present action on November 24, 1987, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.,* alleging sexual harassment, sexual assault and rape by her supervisor, GE Graphics Manager James Neal.

### B. *The Graphics Office*

During the relevant time period, Spencer worked in the Graphics Office (hereinafter the "Graphics Office" or "Office") at a GE facility in Springfield, Virginia. The Graphics Office is located in one of a group of trailers connected by a series of hallways. These trailers also house a number of administrative offices. (Kudick, TR 3–190–98). Due to the classified nature of the Graphics Office work, the Office was "secured"; access could only be obtained through cipher-locked doors. Entry through these doors was accomplished by pushing buttons in a three-digit sequence, and it normally took two to three seconds to open the doors. (Kudick, TR 3–136). Only the Graphics Office employees knew the cipher combinations; all other employees, including Neal's supervisors, knocked at the door to gain entry. (Ellis, TR 5–450–52).

It is undisputed that, during the relevant time period, Neal was the manager of the Graphics Office and was the sole immediate supervisor of the employees who worked there. Six GE employees worked

The trial transcript, consisting of 2214 pages spanning twelve volumes, is referred to throughout this Opinion as "TR". The transcript for certain days of the trial consumes multiple volumes. Therefore, transcript references will typically include the day of trial, the partial transcript volume number and the page numbers involved. For example, TR 6–P3–50 refers to the transcript taken on day six of the trial, partial volume number three, at page 50.

under Neal: Spencer, Harriet Standish, Debbie Evans–Doyle, Deborah Fulton Dempsey, Michael Kudick, and Judy Guilliams. Kudick left GE in January, 1986, and Standish left in August, 1986. Neal, in turn, reported to his supervisor, Paul Pelotte, who reported to Donald North, GE Program Resource Integration Manager. After Pelotte was transferred in May, 1985, Neal reported directly to North. (North, TR 6–P3–90). Thus, there was no immediate supervisor of the Graphics Office until approximately January, 1986, when Gary Ellis became Neal's acting supervisor. (Ellis, TR 5–432–433). In approximately October, 1986, Ellis was removed as Neal's superior due to a corporate reorganization, leaving Neal without an immediate supervisor. (Ellis, TR 5–459, 465). After the reorganization, Neal reported directly to Wesley West, a Systems Operations Manager.

## C. *Spencer's Allegations*

Spencer's allegations regarding Neal's conduct may be divided into four categories: (1) sexual solicitations; (2) sexual assaults; (3) a rape in October, 1986; and (4) sexual horseplay. The Court's findings with respect to each category are set forth below.

### 1. Sexual Solicitations

Spencer testified that in June, 1984, Neal solicited Spencer to have sexual intercourse with him. (TR 3–281; 4–P2–133–34). On other occasions, Neal asked whether he could see Spencer at her home. (TR 5–374). Spencer's testimony was partially corroborated by Michael Kudick, who testified that, on one occasion, Spencer came to his office, upset and frightened, and told Kudick that Neal had asked her to go to bed with him. (TR 3–86–87). On several subsequent occasions, Spencer complained to Kudick that Neal was pressuring her to have sex with him. (TR 3–87). Neal also asked Kudick a number of times whether Spencer was any good in bed. (TR 3–82). Neal flatly denied ever making sexual propositions to Spencer. (TR 8–60). The Court finds Spencer's and Kudick's testi-

mony sufficient to establish that Neal solicited sex from Spencer.

Spencer testified that she "understood" that her employment would suffer if she did not give in to Neal's advances. (TR 3–290). She vaguely added that this understanding was based on Neal's assertion that he "always get[s] even with anybody that does anything to [him]." (TR 3–290). Shortly after the June, 1984 solicitations, Spencer also expressed to Kudick her fear that she would lose her job if she rejected Neal. (Kudick, TR 3–87). Significantly, however, Neal did not actually threaten Spencer's job or take any adverse action against her in terms of her employment. (*See* Kudick, TR 3–168). The evidence fails to support a conclusion that Neal conditioned Spencer's continued employment on submission to his advances.

Spencer also claims that her promotion within the Graphics Office was conditioned on her submission to Neal's advances. She testified that in May, 1985, Neal proposed to promote her from a level 4 graphics specialist to a level 6 illustrator and told her that the promotion would mean a $4,000 increase in pay. (TR 4–P2–112, 5–369–70; *see also* Neal, TR 8–68). Although her job duties changed, she never received a higher grade level or an increase in pay. (Spencer, TR 3–260–61; Neal, TR 8–71). Additionally, Spencer stated that in October, 1986, in response to her inquiry as to what action had been taken on the promotion, GE's manager of Employee Relations explained that he had never seen any promotion papers. (TR 3–349). Spencer testified that she thought the promotion was offered in exchange for sexual favors, but admitted that Neal never mentioned sex in connection with the promotion. (TR 5–403–05). Apparently, her assumption was based on the fact that Neal allegedly reminded her about the efforts he had made on her behalf and treated her better when his advances succeeded. (TR 5–403–05). Neal, on the other hand, stated that Spencer asked him for a promotion. (TR 8–60). He did the paperwork necessary to recommend Spencer for a grade increase, even though he viewed plaintiff as only marginally qual-

ified for the position. (TR 8–60–62, 66, 68; Spencer, TR 4–P2–114).

Spencer points to Neal's treatment of Debbie Evans–Doyle, with whom Neal was having an affair,[3] as evidence that Neal conditioned job benefits on sexual favors. Evans–Doyle received two promotions, one before Spencer started work at the Graphics Office, and one after Spencer was transferred. (PX 44A). Her salary increased 50% over four years, as compared to a 20% increase in plaintiff's salary. (Evans–Doyle, TR 115–16; PX 44A, 47A). Spencer introduced no testimony indicating that Evans–Doyle was not qualified for the promotions or pay increases. The evidence is insufficient to establish that Evans–Doyle received preferential treatment because of her affair with Neal. On the contrary, the Court is satisfied that Evans–Doyle's promotions and salary increases were based on merit, not sexual favors.

## 2. Sexual Assaults

 Spencer claims that from May, 1984 through October 7, 1986, she was subjected to more than one hundred sexual assaults by Neal in the Graphics Office, including forced and painful kissing, exposure and forced touching of his penis, squeezing, kissing, and biting of her breasts, numerous digital penetrations of her vagina, forced oral sex of Spencer upon Neal and Neal upon Spencer and an attempted rape.[4] All these assaults allegedly took place in the Graphics Office during regular business hours, except for one act of forced oral sex, which allegedly took place on a Saturday in 1985 when Spencer claims she and Neal worked alone together. Spencer asserts she resisted Neal by pushing him away and raising her voice in protest. (TR 3–287–90; 4–P2–130, 133).

Predictably, Neal emphatically denies any sexual assaults or sexual encounters whatsoever with Spencer. (TR 8–58–60). Significantly, there was not a single witness to any of the more than one hundred alleged serious sexual assaults spanning over two years. This case involves, therefore, a contest between Spencer's allegations and Neal's denials, and the contest turns on the Court's credibility judgments, the existence or nonexistence of corroborative evidence and circumstances and, ultimately, the burden of proof.

In general, the Court finds that Neal's denials are not entitled to great weight. Neal has been disturbingly untruthful about his relationships with his female subordinates at GE. First, Neal lied about a consensual sexual relationship he had with a female subordinate, Debbie Evans–Doyle. Neal and Evans–Doyle had sexual intercourse at least once a week in the Graphics Office from 1984 through 1986. (Evans–Doyle, TR 6–P1–118).[5] During GE's initial investigation of this matter, however, Neal lied and stated that he never had sexual relations with Evans–Doyle. Moreover, Neal lied under oath during his deposition in this case regarding his relationship with Evans–Doyle. Only when Evans–Doyle came forward at trial and admitted to a regular, ongoing sexual relationship did Neal admit the truth. (TR 8–85).

At trial, Neal also admitted to lying about a consensual sexual encounter with Harriet Standish and Evans–Doyle which took place during a GE business trip in Valley Forge, Pennsylvania. (TR 8–89). Neal denied this encounter took place until Standish told Judy Guilliams in April, 1987. Guilliams testified that Neal approached her and asked that she not reveal the incident in order to protect his career. (TR 7–303). Neal admitted at trial that the Valley Forge incident did indeed take

---

3. *See infra* note 5 and accompanying text.

4. Spencer claims that sometime in 1985, at lunchtime, Neal allegedly came up behind her at a drawing table, announced that there was no one else in the office, and attempted to rape her. According to Spencer's testimony, Neal pushed her up against the wall, pulled down her panties, pulled down his pants, pushed against her

and immediately ejaculated before entering her. (TR 5–273).

5. Significantly, Doyle testified that these encounters occurred prior to commencement of working hours and prior to the arrival of other workers. (Evans–Doyle, TR 6–P1–118).

place.[6] (TR 8–89). In addition, the Court finds Neal's testimony at trial regarding the sexual horseplay in the Office is not credible.[7] In light of Neal's duplicity throughout these proceedings, the Court accords no weight to Neal's denials.

Although the Court finds that Neal's testimony is not generally worthy of belief, Spencer has failed to prove by a preponderance of the evidence that the alleged sexual assaults took place. There was not a single witness to even one of the great number of assaults which allegedly occurred during working hours at the Graphics Office. None of Spencer's fellow employees heard any protests. Spencer's co-employees would likely have heard noises indicating an assault, because the Graphics Office contains very thin walls. Voices and other noises could easily be heard.[8] Significantly, no one ever reported hearing any unexplained sounds. Also significant in this respect was the so-called "three minute rule." Instituted by Spencer's co-employees, this rule was designed to rescue Neal from Spencer's propensity for time-wasting conversations. Under the three-minute rule, one of the female employees interrupted Spencer if she stayed in Neal's office more than several minutes. The rule was apparently enforced, yet no one ever reported seeing any untoward behavior over the more than two-year period that Spencer alleged the behavior occurred. (Guilliams, TR 7–191–92; Dempsey, TR 8–180–81; Standish Deposition, TR 61–62).

Moreover, the fact that no Graphics Office employee saw or heard any evidence of attacks on Spencer is significant in light of the physical layout of the Office and the constant traffic of Office employees through the hallways and equipment rooms. From the time Spencer began work at the Graphics Office until June, 1985, she and Neal had separate, adjacent offices on one side of the hallway, where a photo lab and an equipment room were also located. On the other side of the hallway were a camera room and separate workplaces for the other Graphics Office employees. (PX 72). There was no doorway between Neal's and Spencer's office; entry to each was from the hallway. After June, 1985, Spencer moved to an office on the other side of the hallway with the rest of the employees. Her former office became a second camera room for new equipment, and Neal's office door was moved to open directly into the new camera room rather than to the hallway. (PX 72). After the Office modifications, Neal often worked with his door open. (Kudick, TR 3–195).

Both before and after mid–1985, graphics employees regularly used equipment housed on Neal's side of the hallway. Indeed, some employees used the equipment up to fifteen times a day. (Kudick, TR 3–134–135, 193–97; Guilliams, 7–219–20; Dempsey, 8–176; Standish deposition, TR 50–51). Before the 1985 rearrangement, employees actually had to walk through Spencer's office to use the photo lab or equipment room. (Kudick, TR 3–134–35, 3–199). In fact, Spencer's office was, at that time, a general work area for all employees. (Kudick, TR 3–134). Thus, prior to the Office rearrangement, while Neal was allegedly assaulting Spencer in her office, other employees were routinely

---

6. Neal, however, denied telling Guilliams not to report the incident. (TR 8–86–88). This denial is not worthy of belief.

7. At trial, a number of Neal's subordinates testified that Neal engaged in sexually-oriented horseplay and made numerous statements of a sexual nature. In the face of this testimony, however, Neal denied that he engaged in horseplay of a sexual nature or made statements with sexual connotations. The Court rejects Neal's testimony regarding the sexual horseplay; Neal clearly engaged in sexual horseplay in the Graphics Office. *See infra* pp. 212–215 (Court's findings with respect to sexual horseplay in the Graphics Office).

8. Kudick testified that he could hear laughter and noises coming from Neal's side of the hall. (TR 3–197–199). Judy Guilliams testified that when she was in the camera room, she could hear noises from Neal's office, (TR 7–219–220), and Debbie Dempsey stated that, from the hallway, she could "definitely" hear raised voices from offices on either side of the hallway. (TR 8–178). Finally, Donald North, manager of the Graphics Office from April 1981 to October 1985, testified that the Graphics Office walls were "very thin" and easier to hear through than normally constructed house walls. (TR 6–P3–103–104).

walking through Spencer's office. (*See* Kudick, TR 3–134–35; 3–199). After the changes, employees regularly went past Neal's open office door to use the equipment and the Office refrigerator and to get coffee. (Kudick, TR 3–132–33, 194–95; Guilliams, TR 7–220). Yet no employee ever heard or saw anything out of the ordinary. In the Court's view, these facts do not conclusively preclude Spencer's claims that more than one hundred assaults took place in the Office during normal working hours; they do, however, weigh substantially against those claims.

Spencer charges that one attack occurred on Saturday when she and Neal were working alone together at the Graphics Office. Allegedly, Neal forced Spencer to engage in oral sex on this occasion. (TR 3–277, 281). Spencer first claimed that this attack occurred in the summer of 1985. The relevant time records, however, indicate that Spencer did not work alone with Neal on any Saturday during this period. (TR 8–19–22). Faced with this fact, plaintiff later claimed that the incident took place in the fall of 1985. Plaintiff's inconsistent testimony, in the absence of any circumstantial or corroborative evidence, is insufficient to prove by a preponderance of the evidence that this particular attack occurred. Moreover, these inconsistencies serve to cast serious doubt on Spencer's credibility.

In addition to the absence of any corroborative testimony or significant supporting circumstantial evidence concerning the alleged assaults, Spencer never complained about any assault until October, 1986. In fact, in March, 1986, in response to a direct question by her family physician, plaintiff denied any work-related problems. (Spencer, TR 5–291). Despite her extensive history of gynecological problems, Spencer also never complained of Neal's allegedly painful vaginal penetrations nor any of the other alleged assaults to her gynecologist. (Spencer, TR 5–193–95). Further, she did not reveal Neal's alleged treatment of her when she sought counseling for personal problems in January, 1986. (Spencer, TR 4–P2–84–85, 5–225).

Linda Henderson, Spencer's friend, testified that the first time Spencer mentioned any problems with Neal was in July or August, 1986. (TR 6–P1–58). According to Henderson, Spencer said that Neal "was putting his hands down her blouse and up her skirt," and that Spencer referred to Neal as "the creep" and "the rat." (TR 6–P1–58). Importantly, however, Spencer did not report to Henderson that Neal was routinely forcing intimate sexual contact on her. If Neal had in fact been sexually assaulting Spencer, it seems more likely that she would have revealed this to Henderson, her friend and confidant. As it stands, Henderson's testimony is insufficient to establish that Neal committed any assault on Spencer.

Spencer's failure to complain about any alleged assaults for more than two years is particularly telling in light of the portrait painted of her personality at trial. Several witnesses attested to the fact that Spencer, often inappropriately, volunteered intimate details about herself. For instance, she told Kudick during working hours about her sex life with her on-again, off-again boyfriend, Ed Hosea Greene. (Kudick, TR 3–212). She also revealed to Kudick details about her abusive former husband. (TR 3–215). Further, she discussed her medical problems with Kudick, including her partial hysterectomy and pelvic pain. (TR 3–213). She even lifted her shirt to show Kudick an abdominal surgical scar. (TR 3–213). In fact, Kudick believed that Spencer talked about her personal life more than was appropriate in the workplace. (TR 3–215). Despite Spencer's apparent trust in Kudick, she never told him that Neal had sexually assaulted her. (TR 3–220–22).

Spencer also entrusted co-employee Judy Guilliams with intimate facts about herself. Guilliams recounted that, although she did not consider Spencer a friend, Spencer frequently initiated conversations about her personal problems, boyfriends, health and appearance. (TR 7–168, 173). Spencer even confided that Greene would only allow her to visit him at night and that on one occasion, she had waited for him in the bushes. (TR 7–171). When Guilliams asked Spencer why she put up with Greene,

Spencer replied that he was the "best in bed that she'd ever had and he had magic fingers." (TR 7–174). Further, Spencer revealed on a Monday that she had spent the night with a man she met in a bar on the previous Friday and that she planned to marry him and move to Colorado. (TR 7–182). Although Spencer talked to Guilliams at least two hours per day, she never mentioned any problems with Neal. (TR 7–188, 194–98).

The most striking illustration of Spencer's openness about intimate information is that she took into her confidence Roscoe Childs, a GE carpenter's helper who happened to be working near the Graphics Office. Sex, Greene's sperm count and Spencer's problems with Greene and her co-employees were all topics Spencer talked about to Childs. (Childs, TR 7–51–54). Yet, during conversations occurring over a one-year period, Spencer never mentioned that Neal was sexually attacking her. (7–61–62, 64). Given Spencer's propensity to discuss problems of an intensely personal nature with anyone who would listen, the Court finds it likely that she would have complained before October, 1986 if Neal was indeed sexually assaulting her.

On October 24, 1986, Spencer reported to Steve Zimmerman of GE's Employee Relations department that she was being sexually harassed by Neal. At that meeting, she said only that Neal had made sexual advances and was inappropriately touching her.[9] (TR 3–307–309, 311; 4–P2–37). On October 27, Spencer met with Cindy Selles, a GE Employee Relations Specialist. Not until this meeting did Spencer complain of the rape as well as Neal's sexual advances. (Selles, TR 7–68–72; 7–100–103). Significantly, however, Spencer never mentioned anything to Zimmerman or Selles about the seventy-five to one hundred instances of digital penetration of her vagina. (Selles, TR 7–71). She also did not report these

assaults to GE investigators or to the EEOC in February, 1987. (See PX 71, 71A).

Spencer asserts that she did not report Neal's assaults because when Neal touched her sexually, she was embarrassed and "mentally removed herself" from the situation. (TR 5–261–62, 314). According to Spencer's psychatric expert, Dr. Simon, Spencer's preexisting personality disorder caused her to "disassociate" and deny what was happening to her. (TR 4–P1–40, 58–61, 68–9). The alleged harassing events, according to Dr. Simon, exacerbated Spencer's personality disorder and eventually led her to develop post-traumatic stress disorder (PTSD). (TR 4–P1–59, 5, 39). Dr. Simon added that Spencer's mental condition interferes with her ability to recall details. (TR 4–P1–73–74).

GE's psychiatric expert, Dr. Richard Ratner, disagreed with Dr. Simon's diagnosis of PTSD and concluded that Spencer suffers from a histrionic personality disorder and possibly depression. (TR 8–112–13). A histrionic personality disorder develops over a lifetime and is characterized by immaturity, shallowness, self-centeredness, obsession with one's personal appearance and exaggerated emotionality. (TR 8–124, 142, 144). In Dr. Ratner's opinion, Spencer's memory problems resulted from convenient selectivity rather than emotional trauma. (TR 8–130).

Having observed Spencer's demeanor at trial and heard hours of testimony from and regarding Spencer, the Court must note that Dr. Ratner's conclusions ring true. In any event, whatever the correct diagnosis, Dr. Simon's testimony regarding Spencer's reasons for failing to report the rape is not persuasive on the crucial issue facing the Court. While his testimony potentially mitigates a weakness in Spencer's case, it does nothing to establish that the assaults actually took place.[10]

---

9. Specifically, Spencer claimed she told Zimmerman that Neal had been exposing himself and that he was "after" her. (TR 3–308–309). Zimmerman advised Spencer to talk to Ms. Selles, a GE Employee Relations Specialist.

10. In addition to Dr. Simon's testimony, Gretchen Gurbiel, a social worker with Human Affairs, Inc. (HAI), an employee counseling firm under contract with GE, and Peggy Harris, a counselor with the Sexual Assault Victims Advocacy Service (SAVAS), testified that they believed plaintiff's accounts of the sexual assaults

In sum, the Court finds that, although Neal's testimony is not generally credible, Spencer has failed to carry her burden of proving the sexual assaults by a preponderance of the evidence. It is possible that the assaults did indeed occur, but it is equally possible that they did not. The evidence, in short, is in equipoise. Spencer's testimony and the remainder of her evidence are not enough to tip the scales in her favor. Accordingly, the Court cannot find that Neal sexually assaulted Spencer.

### 3. The October, 1986 Rape

■ Spencer alleged that she was raped by Neal on October 7, 1986, during the office lunch hour. According to Spencer, she had gone into Neal's office to ask him a question, and Neal started to put his hand down her blouse and up her skirt. She stopped Neal and later attempted to leave, but Neal allegedly forced her to the floor and pulled her pantyhose down. While she was on her hands and knees with her pantyhose part way down her thighs, Neal allegedly raped her from behind. (TR 5–308). Spencer first reported the alleged rape to GE on October 27, 1986. Neal denies that he raped Spencer.

As with the alleged sexual assaults, the Court finds that Spencer has failed to prove by a preponderance of the evidence that the alleged rape occurred. No one in the Office heard the rape or Spencer's pro-

tests.[11] Moreover, Spencer's telephone records indicate that at approximately 12:30 p.m. the day of the alleged rape, she called her exterminator from her bank, which was approximately a five to ten minute drive from the Office, to discuss a returned check. (TR 5–308). Thus, if Spencer's version of the events is to be believed, she went to her bank immediately after being raped. Spencer also cashed a check at her bank sometime before 2:00 p.m. that day. Such behavior weighs against Spencer's claim that she had been raped shortly before these events occurred.

The credibility of Spencer's story is further diminished by the fact that, in contrast to her trial testimony, she told Cindy Selles in October, 1986 that Neal had forced her to have intercourse "about three or four months ago." (TR 7–68–72; 7–100–103). Additionally, Spencer's medical records reflect that she told Dr. Isidro, the admitting psychiatrist at Prince William Hospital, that Neal had raped her twice, rather than once. (PX 64). These inconsistencies are not inconsequential; they, too, weigh against Spencer's claims.

On the issue of Spencer's credibility, the Court is also disturbed by the disappearance of certain diaries which Spencer kept at the Graphics Office. These diaries were reviewed by GE personnel after Spencer lodged a complaint against Neal and were then given back to Spencer. (Guilliams, TR

and rape to be credible. Harris also recounted plaintiff's violent nightmares in which a man was trying to kill her. (Gurbiel, TR 2–P2–20–21; Harris, TR 6–P1–85–91). Moreover, when plaintiff was hospitalized in a psychiatric unit in 1987 for depression, the admitting psychiatrist, Dr. Isidro, diagnosed plaintiff as suffering from severe depression caused in part by sexual harassment allegedly suffered at work. (*See* PX64, "Discharge Summary"). The Court, however, declines to consider this testimony as evidence that the assaults and rape occurred. Such testimony would necessarily reflect an opinion as to plaintiff's credibility and thus invade the province of the factfinder. *See Spencer v. General Electric,* 688 F.Supp. 1072, 1077 (E.D.Va.1988) (Dr. Simon's testimony that plaintiff suffers from post-traumatic stress disorder is inadmissible to prove that the rape or sexual assaults actually occurred). In any event, the Court did not find this opinion testimony persuasive or worthy of weight.

11. Exactly when the alleged rape occurred and who was present in the Office at that time are unclear. Spencer alleges that the rape took place during the normal Office lunch hour, 11:00 to 12:00, on October 7. Guilliams testified, however, that she, Evans–Doyle, and Dempsey all had lunch with Neal in his office that day. (TR 7–198–201). But Guilliams also testified that she had a dentist appointment that day and may not have returned to the Office until 11:00 or 11:30 a.m., (TR 7–262–263), and that Dempsey and Evans–Doyle could have been out of the Office between 11:00 and 11:30 a.m. purchasing art supplies and sandwiches. (TR 7–268–269). Neal himself admitted that it was possible that he could have been alone with Spencer the morning of the alleged rape. (TR 8–96–98). The mere possibility that Neal could have been alone with Spencer, however, is by itself insufficient to prove that the rape actually happened.

7–235). Although the diaries recorded personal information about Spencer's love life, there was no mention of Neal. (Guilliams, TR 7–230–34; Dempsey, TR 8–187–88). While two GE employees verified the existence and contents of the diaries, Spencer testified at trial that she does not recall keeping any diaries. (TR 5–282–86). When questioned by GE's psychiatric expert about the diaries prior to trial, Spencer replied that the diaries would "never turn up." (Ratner, TR 8–129). The Court concludes that Spencer was deliberately untruthful in this regard, and such behavior raises serious questions about the reliability of her testimony as a whole.

As to her failure to report the rape until approximately three weeks after it allegedly happened, Spencer again asserts that she blocked the incident from her mind. She testified that after the rape, Neal cleaned himself off with a handkerchief and she went to the restroom, where she threw up; allegedly, she remembers nothing of the remainder of the day. (TR 3–295, 5–311). Dr. Simon reported that Spencer suppressed her memories of the rape and denied what had happened. (TR 4–P1–68–69). As with the sexual assaults, however, the Court finds that Spencer's and Simon's explanation as to why Spencer failed to report the alleged rape has no bearing on whether the rape occurred. Although the Court does not credit Neal's testimony that the rape did not occur, Spencer has failed to carry her burden of proof.

### 4. Sexual Horseplay

Spencer also asserts that rampant sexual horseplay in the Graphics Office created a hostile working environment and that GE management was or should have been aware of the horseplay. She claims that, on virtually a daily basis, Neal engaged in horseplay of a sexual nature with his female subordinates, including sitting on their laps, touching them in an intimate manner and making lewd comments. Here again, Neal denies engaging in such activity. But here, unlike the allegations with respect to the sexual assaults and rape, Spencer's allegations are corroborated by the testimony of the other Graphics Office employees.

It is clear from the testimony of Spencer and other employees that sexual horseplay was commonplace in the Office. Spencer testified that, on several occasions, Neal licked Evans–Doyle's glasses and suggested what else he could do with his tongue sexually. (TR 3–266, 272). Neal denies such conduct, but the testimony of other employees supports Spencer's allegations. Kudick testified that Neal licked Evans–Doyle's glasses on several occasions and that Neal said something to the effect that his licking of the glasses was "symbolic of his sexual ability with his tongue." (TR 3–57). In addition, both Dempsey and Guilliams testified that they saw Neal lick Evans–Doyle's glasses. (TR 8–199; 7–243). Kudick also stated that Neal remarked that he, Neal, could "lick his eyebrows with his tongue" and that his tongue "could be put to better use in a sexual situation." (TR 3–70). On almost a daily basis, Neal would sit on the laps of some of his female subordinates and put his hands on their knees or between their legs.

The record also reflects that Neal frequently made comments of a sexual nature. For example, Neal often remarked that "he hadn't had any lately," referring to sexual relations. (TR 3–266; 7–245). Often, Neal told jokes and stories about the length of his penis (TR 3–68–74). Neal also made sexual comments about the female members of the staff, such as whether Spencer was "any good in bed." (TR 3–82). He joked with his female subordinates, other than plaintiff, about his "little banger," referring to both his pipe tamper and penis. (7–243–44; 3–69; 3–264, 271). Neal repeatedly teased Dempsey by stating that she needed only a training bra. (TR 8–196). Additionally, Neal exclaimed in the presence of Spencer and others that women "have shit for brains" and should be "barefoot and pregnant." (TR 3–74–75, 164).

Neal admitted to engaging in some horseplay, but stated that the horseplay and statements were not intended to be sexual in nature. For instance, he acknowledged throwing pennies down Demp-

sey's blouse (TR 8–94), unbuttoning several buttons on Standish's skirt (TR 8–74), sitting on female subordinates' laps approximately once or twice a week, putting his hands on their knees "as a threat" and referring to his pipe tamper as his "little banger," (TR 8–79–83), but testified that he "never had any sexual things [sexual connotations] behind" his horseplay and statements. (TR 8–81). The Court, however, finds Neal's assertion contrary to common sense. The testimony of Kudick, Guilliams, Standish, and Evans–Doyle regarding the sexual horseplay in the Office is persuasive. Clearly, Neal engaged in sexual horseplay and made comments of a sexual nature in the Graphics Office on a regular basis.

Neal, however, was not the only person in the Graphics Office who engaged in horseplay and made sexual remarks. Indeed, Evans–Doyle, Dempsey, and Guilliams all joined in the horseplay. Kudick testified that everyone would get together in the morning, usually in Evans–Doyle's office, and Evans–Doyle, Neal, Dempsey, and Guilliams would tell dirty stories and jokes. (TR 3–58). According to Kudick, these meetings were a "daily occurrence." (TR 3–58, 161). In addition, Evans–Doyle, Dempsey, Guilliams, and Standish would flip Neal's tie, roll up his pant legs or roll down his socks, untie his shoes, and snap his waistband and belt. There were water-gun fights and jelly-bean fights in which everyone, except Spencer and Kudick, would participate. Also, everyone, except Spencer and Kudick, would refer to Neal's pipe tamper as his "little banger," and all recognized the double-entendre. It is evident from the testimony of all the Office employees that horseplay was rampant. Some horseplay was juvenile and inoffensive, but much was sexual in nature.

It is also clear that Neal engaged in consensual sexual relations with at least two of his female subordinates during Spencer's tenure in the Graphics Office. Neal and Evans–Doyle had intercourse in

the Office at least once a week. Moreover, Neal, Standish and Evans–Doyle had a sexual encounter during a business trip, and Neal and Standish had at least one additional encounter. (Neal, TR 88–89). Plaintiff had heard rumors about Neal's and Evans–Doyle's affair before starting work at GE. (Spencer, TR 4–P2–38). Her observation of their behavior in the Office reinforced her belief that the two were having an affair. (TR 4–P2–38–39). Both plaintiff and Kudick witnessed Neal touching Evans–Doyle in an intimate manner at the Office. (TR 3–265–66, 4–P2–38; 3–229). When Spencer first complained to Zimmerman of GE's Employee Relations department, she told him that she believed Neal and Evans–Doyle were having an affair. (TR 4–P2–38).

With the exception of one incident, none of the Office horseplay was directed at Spencer. (Guilliams, TR 7–318–319). Kudick testified that in February, 1984, Neal sat in Spencer's lap and tried to reach under her skirt and to put his hand between her legs, as he did with other female subordinates. (TR 3–80–81). Spencer was reportedly "very indignant, very upset." (TR 3–81). She received a glare from Neal for her resistance. (TR 3–81). Although Spencer testified that Neal, on subsequent occasions, again attempted to sit in her lap, (TR 3–280), no one in the office, including Kudick, ever observed further physical contact between Spencer and Neal. (Kudick, TR 3–81). Indeed, as Spencer admits, except for the February, 1984 lap-sitting incident, every alleged assault and solicitation was unobserved. (See Plaintiff's Proposed Findings of Fact and Conclusions of Law at 8–9, ¶ 16(f)).

Except for Spencer and Kudick, the Office employees generally found the horseplay funny and inoffensive. (See Guilliams, 7–245–249). There is some evidence, however, that Standish and Guilliams eventually began to regard Neal's behavior as inappropriate. (Standish Deposition, TR 32–34; Guilliams, TR 7–303–07).[12] As for

---

12. Standish testified that she began to feel uncomfortable about the work environment and to believe that it was inappropriate. (Standish Deposition, TR 32–34). She qualified this statement, however, by saying that the horseplay was not inappropriate because it was sex-based.

Kudick and Spencer, they were "outcasts," refusing to engage in any office horseplay, sexual or otherwise.[13] Spencer testified that she was appalled and shocked when, on her first day of work at the Graphics Office, she observed Neal and two of his female subordinates trying to take off each other's shoes. (TR 3–261–62). Thereafter, she did not participate in the horseplay because she did not approve of it and did not like it. (TR 3–266). Kudick verified that plaintiff was shocked, disgusted and annoyed by the Office environment. (TR 3–63). Moreover, according to Kudick, the horseplay led to a distracting work atmosphere. (TR 3–210). In October, 1986, Spencer reported to GE Employee Relations Specialist Cindy Selles that she was upset about the Office environment and felt that she had been harassed by Neal and everyone else in the Office. (Selles, TR 7–68).

The horseplay was made possible in part by the "hands off" attitude of GE management toward the Graphics Office and Neal. (*See* Ellis, TR 5–463). Neal was given a free rein despite supervisor Paul Pelotte's knowledge of the casual manner in which Neal managed the Graphics Office. According to the testimony of Kudick and Guilliams, which the Court finds credible, Pelotte often referred to the Graphics Office staff as "Jim's harem" and "the animals." (Kudick, TR 3–59–60; Guilliams, TR 7–247–248). Gary Ellis, Neal's supervisor from January to September, 1986, reported in Neal's November, 1986 performance appraisal that Neal's informal management style and overfamiliarity with subordinates were detrimental to good

management and employee relations. (TR 5–442; PX 46(b)). Ellis therefore believed that, although Neal needed a freer hand than most managers because of the Graphics Office's work, Neal needed to be managed more closely. (TR 5–439, 443). Ellis also recognized that the Graphics Office, because of security considerations, was segregated from the rest of GE's Springfield office. (TR 5–447–50). It was therefore difficult to know what was happening in Neal's office at any given time. (TR 5–448). However, Ellis' supervisor, who was the head of GE's Springfield operation, instructed Ellis to "back off" Neal. (Tr. 5–436, 447, 455–56). Consequently, Ellis ceased bothering Neal about routine administrative tasks. (TR 5–457–58). Shortly after Ellis was directed to leave Neal alone, Ellis was removed as Neal's supervisor due to a corporate reorganization. (TR 5–459, 465). The reorganization left Neal without a direct supervisor. (TR 5–459).

D. *GE's Response to Plaintiff's Complaint*

After Spencer reported the alleged sexual assaults and sexual harassment to GE management on October 24, 1986, GE immediately transferred her out of the Graphics Office. (Selles, TR 7–76). Eventually, she was placed in a graphics specialist position at the same grade level in the Reston, Virginia office. (Spencer, TR 3–309, 3–319–20). GE also initiated an investigation of Spencer's charges. (Coleman, TR 6–P3–18). Matthew Coleman, a high-level Equal Opportunity Manager, headed the investigation. (TR 6–P3–17). Coleman promptly

---

(Standish Deposition, TR 34). During GE's internal investigation of Spencer's charges, Guilliams reported to Cindy Selles that Neal "victimized all the vulnerable women" in the Office. She explained at trial that the comment was purely emotional. (TR 7–309).

13. Spencer herself admitted that she and Kudick were outcasts. (TR 5–320). In addition to her alienation from Neal, she felt mistreated by the other women in the Graphics Office. (TR 4–P2–115). She complained that Evans–Doyle would never talk to her and related that Dempsey had placed a sign reading "Anne's Office" on the public telephone, reflecting Dempsey's belief that Spencer was constantly on the phone rather

than working. (Spencer, TR 4–P2–118–120). Spencer found this behavior "immature." (TR 4–P2–120).

It is not clear whether Spencer participated in antics such as the tie-flipping and water-gun fights. For example, Judy Guilliams testified that Spencer did engage in water-gun fights. (TR 7–244–45). Yet, even if plaintiff did engage in some of the milder horseplay, her joining in the horseplay in a consensual setting "does not 'waive her legal protections against unwelcome harassment.'" *Swentek v. USAir*, 830 F.2d 552, 557 (4th Cir.1987) (quoting *Katz v. Dole*, 709 F.2d 251, 254 n. 3 (4th Cir.1983)).

interviewed witnesses and compiled a detailed and thorough report, which included specific recommendations for further action. (TR 6–P3–23, 8–15–16). In December, 1986, Neal was removed from his management position for maintaining an inappropriate office environment; he was permitted to remain in the Graphics Office as an artist. (West, TR 7–340–41). His former subordinates and GE's customers were notified of the demotion. (West, TR 7–342) GE, however, did not reduce his pay and in fact, increased his pay by four percent in early 1987. (West, TR 7–342–43, 344). In April, 1987, after his untruthfulness about his relationships with his subordinates came to light, he resigned when faced with the choice of either resigning or being terminated. (West, TR 7–346–47).

E. *GE's Sexual Harassment Policy*

At the time Spencer began working in the Graphics Office and throughout her tenure there, new employees at the Springfield facility received a copy of GE's Handbook for Exempt Employees. (GE Exhibit [hereinafter "GEX"] 51; Selles, TR 7–84–89; Guilliams, TR 7–249–51; Standish Deposition, TR 76). The handbook contains a policy entitled "Employee Conduct and Corrective Discipline." This policy prohibits horseplay, use of obscene language, assault and immoral acts committed on Company property. Additionally, it notifies employees of an appeals procedure pursuant to which employees who have complaints or problems can bypass their direct supervisors.

Since 1986, GE has advised all new employees during their orientation that sexual harassment is impermissible. (Selles, TR 7–77–84; GEX 45). In May, 1988, a GE division which includes the Springfield Graphics Office issued a written, detailed anti-sexual harassment policy to all employees. (West, TR 7–338–40; GEX 74). The policy defines sexual harassment to include situations in which an individual is "offended by the sexual interaction, conduct of [sic] communications between others." (GEX 74).

CONCLUSIONS OF LAW

This sexual harassment action was brought by plaintiff under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* The Court has jurisdiction over this action pursuant to 42 U.S.C. § 2000e–5(f)(1) and (3).

The Fourth Circuit has defined two basic varieties of sexual harassment in the Title VII context: "harassment that creates an offensive environment ('condition of work') and harassment in which a supervisor demands sexual consideration in exchange for job benefits ('*quid pro quo*')." *Katz v. Dole,* 709 F.2d 251, 254 (4th Cir.1983) (citing *Henson v. City of Dundee,* 682 F.2d 897, 908 n. 18 (11th Cir.1982)). Plaintiff here alleges that Neal's conduct gives rise to causes of action for both forms of gender discrimination. At trial, plaintiff grouped together her allegations of sexual solicitations, assault, rape, and horseplay in support of her sexual harassment claims. The Court has found, however, that plaintiff failed to prove the alleged sexual assaults and rape. Therefore, the Court may look only to the sexual solicitations and horseplay to determine whether plaintiff has established her *quid pro quo* and hostile environment claims.

A. *Quid Pro Quo*

In order to prevail on a *quid pro quo* case of sexual harassment, the following elements must be proved:

(1) The employee belongs to a protected group.

(2) The employee was subject to unwelcome sexual harassment.

(3) The harassment complained of was based upon sex.

(4) The employee's reaction to harassment complained of affected tangible aspects of the employee's compensation, terms, conditions, or privileges of employment. The acceptance or rejection of the harassment by an employee must be an express or implied condition to the receipt of a job benefit or the cause of a tangible job detriment in order to create liability under this theory of sexual harassment. As in the typical disparate

treatment case, the employee must prove that she was deprived of a job benefit which she was otherwise qualified to receive because of the employer's use of a prohibited criterion in making the employment decision.

(5) Respondeat superior.[14]

*Jones v. Flagship Int'l,* 793 F.2d 714, 721–22 (5th Cir.1986) (quoting *Henson v. City of Dundee,* 682 F.2d 897, 909 (5th Cir.1982) (citations omitted)), *cert. denied,* 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987); *see also Glezos v. Amalfi Ristorante Italiano, Inc.,* 651 F.Supp. 1271, 1276 (D.Md. 1987); 29 C.F.R. § 1604.11(a) (1986).

 As to the first element of a prima facie case, Spencer showed that she belongs to a protected group. She also met the second and third elements, proof of unwanted harassment based on sex. Although she did not prove that Neal sexually assaulted her, she established one incident of unwelcome physical contact and several sexual solicitations. Nevertheless, Spencer's *quid pro quo* case fails because she cannot make out the fourth element of a prima facie case. She has not shown that job benefits hinged on her submission to Neal's advances.

There is no persuasive testimony indicating that Neal threatened to retaliate against Spencer in terms of her employment if she refused to have intercourse with him. Nor is there any evidence that Neal, in the over two and one-half years he supervised Spencer, took any action against her because she did not give in to his alleged solicitations. With respect to the alleged denial of a promotion, Spencer testified only that she assumed that the promotion was offered in exchange for sex. She admitted that Neal never mentioned sex in connection with her promotion. She could not support her assumption with anything more than vague references to Neal's comments about helping her in her employment and being nicer to her when his sexual advances succeeded. The Court finds this testimony insufficient to establish any causal connection between plaintiff's fail-

ure to succumb to Neal's alleged requests and her failure to receive a promotion. The promotions Evans–Doyle received before Spencer started work in the Graphics Office and after Neal was demoted do not support Spencer's claim that those who succumbed to Neal received favorable treatment. In any event, Neal did indeed submit the necessary paperwork for plaintiff's promotion to higher management for approval. The fact that the promotion did not take place is therefore not evidence that Spencer refused *quid pro quo* propositions by Neal.

### B. *Hostile Environment*

To prove a claim of hostile environment, plaintiff must show "that the conduct in question was unwelcome, that the harassment was based on sex, and that the harassment was sufficiently severe or pervasive to create an abusive working environment." *Swentek v. USAir, Inc.,* 830 F.2d 552, 557 (4th Cir.1987); *see also, Katz,* 709 F.2d at 256; *Henson,* 682 F.2d at 904–04. The plaintiff must also show "some basis for imposing liability on the employer." *Swentek,* 830 F.2d at 557. The employer is liable where it has "actual or constructive knowledge of the existence of a sexually hostile working environment and took no prompt and adequate remedial action." *Id.* at 558. In establishing the employer's knowledge, the plaintiff may show that "complaints about the harassment were lodged with the employer or that the harassment was so pervasive that employer awareness may be inferred." *Katz,* 709 F.2d at 255, *quoted in Swentek,* 830 F.2d at 558.

 Evaluation of hostile environment claims requires a four-step analysis:

(1) the harassment was unwelcome;

(2) the harassment was based on sex;

(3) the harassment was sufficiently severe or pervasive to create an abusive working environment; and

(4) the employer had actual or constructive knowledge of the sexually hos-

---

**14.** An employer is strictly liable for *quid pro quo* harassment by supervisors. *See Meritor*
*Savings Bank v. Vinson,* 477 U.S. 57, 70–71, 106 S.Ct. 2399, 2407–08, 91 L.Ed.2d 49 (1986).

tile working environment and took no prompt or adequate remedial action. *Swentek*, 830 F.2d at 557; *Katz*, 709 F.2d at 256; *see also Highlander v. KFC Nat'l Management Co.*, 805 F.2d 644, 649 (6th Cir.1986).

■ Here, Spencer showed that verbal and physical conduct of a sexual nature took place in the Graphics Office, that it was unwelcome to her and that it was based on sex.[15] Further, plaintiff has demonstrated that GE should have known of the conduct given its pervasiveness.[16] The difficult question is whether Spencer has established that the horseplay was sufficiently severe or pervasive to create a hostile working environment. In *Highlander v. KFC National Management Co.*, 805 F.2d 644 (6th Cir.1986), the court approved the following test for assessing the work environment:

> [T]his court must, viewing the totality of circumstances surrounding the alleged incidents of sexual harassment, consider whether the charged sexual harassment [sic] had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive working environment

that affected seriously the psychological well-being of the plaintiff. In passing upon the question, [the court] adopt[s] the perspective of a reasonable person's reaction to a similar environment under similar or like circumstances to determine if the defendants' conduct would have interfered with the work performance and would have seriously affected the psychological well-being of that characterized individual. Assuming that the plaintiff [meets this burden, the court must then] determine if the plaintiff was actually offended by the defendant's conduct and suffered some degree of injury as a result of her exposure to the work environment.

*Id.* at 650.

The Court finds that the conduct complained of would have interfered with the work performance and would have seriously affected the psychological well-being of a reasonable female employee. Plaintiff herself was the victim of at least one unwanted advance shortly after she began working in the Graphics Office. Further, Neal propositioned Spencer on a number of occasions.[17] Spencer also showed that the

**15.** GE asserts that because Neal's conduct also offended Kudick, a male, the harassment was not based on sex. Merely because a male is offended by sexual harassment of females, however, does not absolve the employer of liability. The relevant question is whether the supervisor accorded males and females like treatment. *See Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir.1982). With one possible exception, (*see* TR 3–230), there is no evidence that Neal made verbal or physical advances toward Kudick. Additionally, there is no evidence that Neal touched Kudick in an intimate manner, made jokes about his genitals or made derogatory remarks about his gender.

**16.** Higher management's knowledge that Neal behaved in an overly familiar manner toward his subordinates and its awareness of the freedom Neal enjoyed due to security considerations are additional grounds for imposing liability for Neal's actions on GE.

GE argues that because plaintiff in all likelihood received an employee handbook which prohibited horseplay, assault, obscene language and immoral conduct and contained a grievance procedure, it is absolved from liability for Neal's conduct. Even if an employment policy could obviate constructive knowledge of sexual harassment, however, GE's policy was not suffi-

ciently specific to inform plaintiff that sexual harassment was prohibited. *See Meritor Savings Bank v. Vinson*, 477 U.S. 57, 72–73, 106 S.Ct. 2399, 2408–09, 91 L.Ed.2d 49 (1986). GE did not adopt a specific anti-sexual harassment policy until shortly before the trial in this matter.

**17.** The lap-sitting incident and the propositions about which plaintiff testified occurred more than 300 days before plaintiff filed her EEOC charge. 42 U.S.C. § 2000e–5(e). The parties have not specifically addressed whether this conduct may be considered as a predicate for liability for a hostile environment under Title VII. Resolution of the question whether recovery for these specific acts is time-barred, however, is not essential. Even if these acts are outside Title VII's statute of limitations, the Court also admitted evidence concerning the acts for the purpose of placing the sexual horseplay which occurred in the Graphics Office in context. The sexual horseplay, standing alone, is sufficient to establish a hostile environment. *Vinson v. Taylor*, 753 F.2d 141, 146 & n. 41 (D.C.Cir.1985) (dicta) ("Even a woman who was never herself the object of harassment might have a Title VII claim if she were forced to work in an atmosphere in which such harassment was pervasive"), *aff'd*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

workplace was pervaded by sexual innuendo, sexually-oriented games and intimate touching between Neal and his female subordinates. *See Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1415–16 (10th Cir.1987) (evidence of general work atmosphere relevant to issue of whether hostile environment existed); *Broderick v. Ruder,* 685 F.Supp. 1269, 1277 (D.D.C.1988) (same); *Pease v. Alford Photo Indus., Inc.* 667 F.Supp. 1188, 1201 (W.D.Tenn.1987) (relying on evidence concerning general work atmosphere to find hostile environment); *Delgado v. Lehman,* 665 F.Supp. 460, 468 (E.D.Va. 1987) (same). Additionally, Neal on several occasions made derogatory and degrading comments about women in general.[18] *See Delgado,* 665 F.Supp. at 468 (supervisor's derogatory attitude toward and remarks about women created hostile environment). These remarks betray Neal's attitude toward women and the motivation for his conduct. A reasonable employee would have found, and Spencer did find, Neal's conduct and comments offensive, vulgar and inappropriate.

The effect of Neal's behavior was to intimidate and ostracize those employees who did not approve. This intimidation and ostracism would have caused a reasonable person, and did cause Spencer, significant emotional distress. Spencer also feared that her job would suffer because of her attitude toward Neal, as would any reasonable employee in her situation. *see, Pease v. Alford Photo Indus., Inc.,* 667 F.Supp. 1188, 1192, 1201–02 (plaintiff who established hostile environment testified that supervisor's conduct made her upset, tense and apprehensive). Neal's behavior created a work atmosphere which was inconsistent with Title VII's goal of promoting sexual equality in the workplace. *See Mer-*

*itor,* 477 U.S. 57, 64–67, 106 S.Ct. 2399, 2404–06. Accordingly, Spencer has established her claim of a hostile work environment.

## C. *Remedy*

▮ Although Spencer has shown that she was forced to work in a hostile environment, she has not demonstrated that she suffered any tangible loss as a result of Neal's conduct. In large measure, her claims for monetary relief hinged on her allegations that she was subjected to *quid pro quo* harassment and sexual assaults. Because she failed to prove such conduct, she is not entitled to monetary relief. Further, her claims for reimbursement for lost overtime hours and lost promotional opportunities due to her transfer to the Reston office are speculative; no recovery on these claims is warranted.[19] Injunctive relief is also inappropriate, given that Neal no longer works at GE and that GE has instituted a comprehensive anti-sexual harassment policy. It is regrettable that GE did not uncover the problems in the Graphics Office before Spencer complained in October, 1986. The Graphics Office was a workplace at odds with good manners, good taste, professionalism and most importantly, Title VII. While the problem should have been discovered sooner, GE, since learning of the problem, has taken appropriate steps to remedy it and prevent it from happening again.

In this situation, plaintiff is entitled only to nominal damages and possibly attorneys' fees for prosecution of the hostile environment claim. *See Katz v. Dole,* 709 F.2d 251, 253 n. 1 (4th Cir.1983); *Henson v. City of Dundee,* 682 F.2d 897, 905 (11th Cir. 1982).[20] Accordingly, plaintiff is awarded

---

18. Presumably, GE would argue that Neal's comments about women were not meant to be taken seriously. However, at least some of Neal's subordinates did not understand that the remarks were made in jest. According to Kudick, they were received with mixed reactions. (TR 164–66).

19. With regard to lost overtime, the record shows that overtime was not available at the Springfield office in 1987 and 1988. (Guilliams, TR 7–22). Accordingly, had plaintiff remained

at Springfield, overtime opportunities would not have been available. As to lost promotional opportunities due to the transfer, plaintiff has provided the Court no reasonable basis for quantifying any difference between promotions available at Springfield and promotions available at Reston.

20. *But see Bohen v. City of East Chicago,* 799 F.2d 1180, 1184 (7th Cir.1986) (indicating that nominal damages are not recoverable under Title VII).

nominal damages of $1.00. Counsel are directed to meet on or before October 14, 1988 to attempt to reach agreement on the amount of fees to be awarded. Should an agreement be reached, counsel shall advise the Court in writing on or before October 19. If agreement is not reached, plaintiff's counsel are directed to submit a properly supported request for fees by October 24. Defendant GE may respond to the request on or before October 28, and plaintiff may file a rebuttal on or before November 3, 1988.